Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN JACKSON, Derivatively and on Behalf of MABVAX THERAPEUTICS HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> J. DAVID HANSEN, GREGORY P. HANSON, KENNETH M. COHEN, JEFFREY F. EISENBERG, ROBERT E. HOFFMAN, PHILIP O. LIVINGSTON, PAUL V. MAIER, JEFFREY V. RAVETCH, and THOMAS C. VARVARO, <br><br> Defendants, <br><br> and <br><br> MABVAX THERAPEUTICS HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. **'18CV2302 BEN BGS** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMAND** |

**INTRODUCTION**

1.     Plaintiff Brian Jackson ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant MabVax Therapeutics Holdings, Inc. ("MabVax" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants J. David Hansen, Gregory P. Hanson, Kenneth M. Cohen, Jeffrey F. Eisenberg, Robert E. Hoffman, Philip O. Livingston, Paul V. Maier, Jeffrey V. Ravetch, and Thomas C. Varvaro (collectively, the "Individual Defendants," and together with MabVax, "Defendants") for breaches of their fiduciary duties as directors and/or officers of MabVax, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

2.     The allegations in this Complaint are made upon Plaintiff's personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MabVax, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

3.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of MabVax's directors and officers from June 30, 2014 through the present (the "Relevant Period").

4.     MabVax is a clinical stage biopharmaceutical company that discovers, develops, and commercializes proprietary human monoclonal antibody products and vaccines for the treatment of various cancers.

5.     On July 8, 2014 MabVax Therapeutics Inc. merged with Telik, Inc., resulting in the Company (the "Telik Merger").

6.     During the Relevant Period, the Company relied heavily on the sale of securities to raise funds, raising tens of millions of dollars in various public offerings and private placements.

7.     On January 30, 2018, the Company issued a press release disclosing that MabVax had received a notice that the SEC was conducting an investigation into the Company "relating to certain of the Company's registration statements (and amendments thereto)."

8.     On this news, the Company's share price fell $0.47, or approximately 18%, from the previous day's closing price, closing at $2.19 per share on January 30, 2018.

9.     On May 20, 2018, the Company's independent auditors withdrew their audit reports included in the Company's Annual Reports on Form 10-K for the years 2014, 2015, 2016 and 2017.

Verified Shareholder Derivative Complaint

10.     On May 21, 2018, the Company filed a Form 8-K with the SEC providing further details regarding the SEC's investigation (the "Investigation 8-K"). The Investigation 8-K revealed that the SEC's investigation pertained to whether certain holders of the Company's preferred stock had violated reporting and disclosure requirements, including by failing to disclose that such holders were acting as a group.

11.     As a result of such stockholders acting as a group, the Investigation 8-K disclosed that Company may also have issued shares of common stock in violation of MabVax's organizational documents. The Investigation 8-K disclosed that the Board had concluded that the Company's prior annual and interim period financial statements and registration statements filed since 2014 should not be relied upon "with respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures should not be relied upon."

12.     The Investigation 8-K noted that the Board had appointed a special committee (the "Special Committee") "comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation."

13.     With respect to the Company's SEC filings, the Investigation 8-K revealed that investors should not rely on financial statements or beneficial ownership as reported in the Company's "Annual Reports on Form 10-K for the years 2014, 2015, 2016 and 2017," and that the Company would not be able to timely file its Form 10-Q for the fiscal quarter ended March 31, 2018.

Verified Shareholder Derivative Complaint

14.     On this news, the Company's share price fell $0.41, or approximately 23%, from the previous trading day's closing price, closing at $1.36 per share on May 21, 2018.

15.     On June 28, 2018, the Company filed a Form 8-K with the SEC revealing that the Company had received a superseding letter from NASDAQ, informing the Company that it had determined to shorten the time for MabVax to submit a plan to regain compliance with filing requirements "based upon the Company's continued delay in filing the Form 10-Q and the disclosure that the Company's independent auditor withdrew its audit reports included in the Forms 10-K for the years ended December 31, 2014, through 2017."

16.     On this news, the Company's share price fell $0.05, or approximately 5.5%, from the previous trading day's closing price, closing at $0.85 per share on June 29, 2018.

17.     On July 11, 2018, the Company's common stock was delisted from NASDAQ due to the Company's failure to maintain $2.5 million in stockholders' equity and its failure to timely file reports with the SEC.

18.     On August 1, 2018, MabVax issued a press release revealing that, as of July 31, 2018, four members of the Company's Board had resigned. Based on the Company's website, Defendants Kenneth M. Cohen, Jeffrey F. Eisenberg, Paul V. Maier, and Thomas C. Varvaro were the directors who resigned. These directors were members of the Special Committee.

19.     In the same press release, the Company announced that Defendant Gregory P. Hanson was appointed to the Board.

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to correctly calculate and report the beneficial ownership of the Company's common stock, resulting in an SEC investigation and delaying the filing of the Company's periodic reports with the SEC (the "Reporting Misconduct").

21.     Further, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to participate in a scheme whereby certain investors in MabVax, including, but not limited to, OPKO Health, Inc. ("OPKO"), Dr. Philip Frost ("Frost"), the Frost Gamma Investments Trust ("FGIT"), Michael Brauser ("Brauser"), Barry Honig ("Honig"), John Stetson ("Stetson"), Alpha Capital Anstalt, and Melechdavid, Inc. (collectively, the "Frost Conspirators") acquired interests in MabVax, commissioned stock promoters to write positive articles and engaged in manipulative trading which raised the price of MabVax shares. The Frost Conspirators then sold their shares in a coordinated fashion, thereby enriching themselves at the expense of other investors. The Frost Conspirators failed to disclose that they were operating as a group, and that they were not passive investors. The misconduct alleged in this paragraph is referred to collectively herein as the "Pump & Dump Misconduct."

22.     The Frost Conspirators all been named as defendants in an action field by the SEC, captioned *SEC v. Barry Honig, et al.*, 18-cv-8175 (S.D.N.Y filed Sept. 7, 2018) (the "SEC Action").

23.     During the Relevant Period, the Company and the Individual Defendants intentionally or recklessly made materially false and misleading statements and failed to disclose material facts regarding the Company's business and operations. Specifically, the Individual Defendants made and caused the Company to fail to disclose that: (1) MabVax engaged in the Reporting Misconduct and the Pump & Dump Misconduct; (2) MabVax had permitted certain shareholders to wield improper influence or control over the Company and its officers and directors; (3) the Company failed to maintain internal controls over financial reporting; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading, and lacked a reasonable basis in fact.

24.     The Company's public statements during the Relevant Period caused MabVax's stock price to be artificially inflated.

25.     The Individual Defendants further breached their fiduciary duties by failing to maintain internal controls and permitting, facilitating, and causing the Company to make false and misleading statements and omissions of material fact, and to fail to correct these false and misleading statements and omissions of material fact.

26.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, as well as its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to being named as defendants in a consolidated securities class action pending in the United States District Court for the Southern District of California (the "Securities Class Action"). The Individual Defendants' misconduct, which has also

6

forced the Company to undertake internal investigations, implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, has and will cost the Company many millions of dollars.

27.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

28.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, three of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the Company's CEO's and CFO's liability in the Securities Class Action and the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the MabVax Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

33.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

34.     Plaintiff is a current shareholder of MabVax. Plaintiff has held MabVax common stock at all relevant times.

### Nominal Defendant MabVax

35.     MabVax is a Delaware corporation with its principal executive offices at 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121. MabVax's common stock traded on the NASDAQ under the ticker symbol "MBVX" from August 17, 2016, until the

Company was delisted on July 11, 2018, and currently trades on the OTC Marketplace ("OTC") maintained by the OTC Markets Group under the same ticker symbol.

**Defendant Hansen**

36.    Defendant J. David Hansen ("Hansen") co-founded MabVax Therapeutics Inc. in 2006, and served as the Company's President, CEO, and Chairman since that date. He has continued to serve in each of these roles following the Telik Merger. According to the Company's Schedule 14A filed with the SEC on May 3, 2017 (the "2017 Proxy Statement"), as of April 18, 2017, Defendant Hansen beneficially owned 176,678 shares of the Company's common stock, representing 2.7% of outstanding shares on that date.[1] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Hansen owned over $344,522 worth of MabVax stock.[2]

37.    For the fiscal year ended December 31, 2016, Defendant Hansen received $975,565 in compensation from the Company. This included $404,746 in salary, $141,400 in bonus, $393,702 in option awards, and $35,717 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hansen received $2,165,915 in compensation from the Company. This included $427,876 in salary, $448,500 in restricted stock unit awards, $1,252,905 in option awards, and $36,634 in all other compensation.

---

[1] Includes 108,967 shares subject to options exercisable within 60 days of April 18, 2017, and 6,238 common stock warrants purchased in the August 2016 financing transaction.
[2] All stock values in this section are adjusted to account for a 1 for 3 reverse stock split which occurred on February 14, 2018.

9

38.     The Company's 2017 Proxy Statement stated the following about Defendant Hansen:

> ***J. David Hansen, 65,***[3]  serves as our President, Chief Executive Officer, and as Chairman of our Board of Directors and, prior to the merger with Telik, Inc. on July 8, 2014 (the "Merger"), served as President, Chief Executive Officer, and Chairman of the Board of Directors of MabVax Therapeutics, Inc. after co-founding the Company in 2006. Mr. Hansen is an experienced biopharmaceutical executive with more than 30 years of industry experience. He has held senior management roles in both private start-up companies as well as small to mid-sized public companies. His senior level experience includes executive management, finance and accounting, corporate development, sales and marketing. During his career, Mr. Hansen has executed a wide variety of in and out licensing agreements, research and development collaborations, joint ventures, divestitures, and acquisitions. Mr. Hansen has developed expertise in the therapeutic areas of immunology, oncology, and infectious disease. Mr. Hansen gained executive management experience at several life sciences companies prior to co-founding the Company that make him particularly suited for his leadership role in the Company. For example, he was a corporate officer of Avanir Pharmaceuticals where he held the titles of Vice President of Commercial Development, Senior Vice President of Corporate Development, and President and Chief Operations Officer of the Avanir Subsidiary Xenerex Biosciences. Prior to Avanir, Mr. Hansen served in multiple roles at Dura Pharmaceuticals including National Sales Director, Director of Marketing, and Director of Business Development. He has additional management experience with Merck & Co. (Schering-Plough), Key Pharmaceuticals, and Bristol Myers Squibb. We believe that Mr. Hansen's extensive experience with public and private pharmaceutical companies in a leadership role qualifies him to serve as the Chairman of our Board of Directors and as our President and Chief Executive Officer.

39.     Upon information and belief, Defendant Hansen is a citizen of the State of California.

---

[3] Emphasis in original unless otherwise noted throughout.

Verified Shareholder Derivative Complaint

**Defendant Hanson**

40.     Defendant Gregory P. Hanson ("Hanson") has served as the Company's CFO since the Telik Merger, and served as CFO of MabVax Therapeutics Inc., from February 2014. He began serving as a member of MabVax's Board on or about August 1, 2018. According to the Company's 2017 Proxy Statement, as of April 18, 2017, Defendant Hansen beneficially owned 80,608 shares of the Company's common stock, representing 1.24% of outstanding shares on that date.[4] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Hansen owned over $157,185 worth of MabVax stock.

41.     For the fiscal year ended December 31, 2016, Defendant Hanson received $476,930 in compensation from the Company. This included $299,342 in salary, $62,790 in bonus, $99,743 in option awards, and $15,055 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hanson received $848,201 in compensation from the Company. This included $309,312 in salary, $277,016 in restricted stock unit awards, $244,945 in option awards, and $36,928 in all other compensation.

42.     The Company's 2017 Proxy Statement stated the following about Defendant Hanson:

> ***Gregory P. Hanson, CMA, MBA, 70,*** serves as our CFO, and prior to the Merger served as CFO of MabVax Therapeutics, Inc. since February of 2014. Mr. Hanson has over 30 years' experience serving as CFO/financial executive/board member of public and private life sciences and hi tech

---

[4] Includes 45,054 shares subject to options exercisable within 60 days of April 18, 2017, and 6,238 common stock warrants purchased in the August 2016 financing transaction.

Verified Shareholder Derivative Complaint

companies. Since October 2016, Mr. Hanson has served as a member of the board of directors of WCCT, Inc., a private pharmaceutical contract research organization. From January 2008 to February 2014 Mr. Hanson was Managing Director of First Cornerstone, a board and management advisory service to companies and executives. From November 2009 to November 2016, Mr. Hanson served as Advisory Board Member of Menon International, Inc., and from October 2011 to September 2016, served on the Life Sciences Advisory Board of Brinson Patrick Securities, a boutique investment bank. Mr. Hanson is Past-President and 10-year Member of the Board of Directors of San Diego Financial Executives International (FEI), and a member of the Capital Formation Committee at BIOCOM since 2011. Earlier in his career, Mr. Hanson gained substantial executive management experience that helped qualify him in his role as CFO. For example, he served as Senior Vice President of Brinson Patrick Securities, where he opened the San Diego branch and introduced at-the-market financing strategies to public life sciences companies. Prior to Brinson Patrick Securities, Mr. Hanson served as Senior Vice President and CFO of Mast Therapeutics (MSTX—NYSE MKT), and prior to Mast Therapeutics was Vice President and CFO, Chief Accounting Officer, Compliance Officer and Corporate Secretary of Avanir Pharmaceuticals, Inc. (acquired by Otsuka Holdings Co., Ltd.), the developer of the cold sore product Abreva™, and Neudexta™, for the treatment of Pseudobulbar Affect, or PBA, a central nervous system disorder. During his career, Mr. Hanson has completed approximately $1 billion in financing, licensing and partnering arrangements. Mr. Hanson was a founding and 6-year member of the Small Business Advisory Committee to the Financial Accounting Standards Board, and has spoken at various national conferences, industry organizations and panels on financing strategy and mergers and acquisitions, and twice spoken to the SEC's Committee on Improvements to Financial Reporting.

Mr. Hanson has passed the examination for Certified Public Accountants and is a Certified Management Accountant. He has an MBA with distinction from the University of Michigan, and a BS in Mechanical Engineering from Kansas State University. From 2008 to September 2016 Mr. Hanson maintained Series 7 & Series 63 securities licenses.

43.    Upon information and belief, Defendant Hanson is a citizen of the State of California.

**Defendant Cohen**

44.    Defendant Kenneth M. Cohen ("Cohen") served as a Director from the time of the Telik Merger until his resignation on July 31, 2018, and prior to that, served as a Director of MabVax Therapeutics Inc. from July 2014. Defendant Cohen was a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Cohen beneficially owned 23,113 shares of the Company's common stock.[5] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Cohen owned approximately $45,070 worth of MabVax stock.

45.    For the fiscal year ended December 31, 2016, Defendant Cohen received $62,278 in compensation from the Company. This included $34,500 in fees earned or paid in cash, and $27,778 in option awards.

46.    The Company's website states the following about Defendant Cohen:

***Kenneth M. Cohen, 61,*** serves as a member of our Board of Directors and, prior to the Merger, served as a member of the Board of Directors of MabVax Therapeutics, Inc. since July of 2014. Since 2007, Mr. Cohen has served either as a board member, executive officer or advisor to various companies, entrepreneurs and investors in the life sciences area. From January 2011 to August 2014, he served as a member of the Board of Directors of Adamis Pharmaceuticals Corporation (Nasdaq: ADMP). He was a co-founder of publicly held Somaxon Pharmaceuticals, and served as its President and CEO from 2003 through 2007 and continued as a director until June 2008. Prior to Somaxon Pharmaceuticals, Mr. Cohen gained executive management and board experience through various executive positions that make him suitable for membership on the Board of Directors of the Company.  For example, he was President and CEO of Synbiotics Corporation; Executive Vice President and Chief Operating Officer for Canji Incorporated, a human gene-therapy

---

[5] Includes 9,318 shares subject to options exercisable within 60 days of April 18, 2017, and 6,238 common stock warrants purchased in the August 2016 financing transaction.

Verified Shareholder Derivative Complaint

company that was acquired by Schering-Plough Corporation; Vice President of Business Affairs at Argus Pharmaceuticals, Inc.; and Vice President of Marketing and Business Development for LifeCell Corporation. Mr. Cohen began his career at Eli Lilly and Company where, among many different responsibilities over ten years, he directed business planning for the Medical Instrument Systems Division and managed the launch of Prozac. He received an A.B. in biology and chemistry from Dartmouth College and an M.B.A. from the Wharton School of the University of Pennsylvania. We believe that Mr. Cohen's 20 years of experience serving as an executive officer including chief executive officer of several life sciences companies, and serving as a member of the board of several life sciences companies qualifies him to serve as a member of the Board of Directors.

**Defendant Eisenberg**

47.     Defendant Jeffrey F. Eisenberg ("Eisenberg") served as a Company director from 2016 until his resignation on July 31, 2018. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Eisenberg beneficially owned 2,253 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Eisenberg owned approximately $4,393 worth of MabVax stock.

48.     For the fiscal year ended December 31, 2016, Defendant Eisenberg received $55,642 in compensation from the Company. This included $16,703 in fees earned or paid in cash, and $38,939 in option awards.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Eisenberg:

---

[6] Includes 9,318 shares subject to options exercisable within 60 days of April 18, 2017, and 6,238 common stock warrants purchased in the August 2016 financing transaction.

14

*Jeffrey F. Eisenberg, 51,* has served as a member of our Board of Directors since February 2016. Mr. Eisenberg has served in a variety of senior management positions, and has developed significant experience in the areas of corporate transactions, strategic alliances, product development, commercialization, manufacturing and talent management. From November 1998 to December 2015 Mr. Eisenberg held various executive management positions including President, Chief Executive Officer and a board member of Noven Pharmaceuticals, Inc., the U.S. prescription pharmaceutical division of Hisamitsu Pharmaceutical Inc., a Japanese pharmaceutical company and the world's largest manufacturer of transdermal drug patches. Mr. Eisenberg led the post-acquisition integration of JDS Pharmaceuticals, a private specialty pharmaceutical company purchased by Noven in 1997, as well as the integration of Noven and Hisamitsu following the 2009 acquisition. From 2007 to August 2014 Mr. Eisenberg also served as President of Novogyne Pharmaceuticals, a Women's Health commercial joint venture between Noven and Novartis Pharmaceuticals Corporation. Mr. Eisenberg was appointed President and Chief Executive Officer of Noven following Hisamitsu's acquisition of Noven. Prior to Noven Pharmaceuticals, Inc., Mr. Eisenberg gained extensive legal experience serving as Associate General Counsel and then as Acting General Counsel of IVAX Corporation, at the time a publicly-traded pharmaceutical company with global operations. Prior to serving at IVAX, Mr. Eisenberg was a lawyer in the corporate securities department of the Florida law firm of Steel Hector & Davis, where he began his professional career in 1990.

Mr. Eisenberg is an expert in corporate governance, having advised the boards of IVAX, Noven and others through several significant internal and external issues, including mergers and acquisitions, corporate financings, strategic alliances, CEO transitions, securities class action lawsuits, FDA warning letters and consent decrees, and development and implementation of corporate governance policies. Mr. Eisenberg holds a BS, Economics degree from the Wharton School of the University of Pennsylvania, and a JD degree from Columbia University Law School. We believe that Mr. Eisenberg's extensive experience in corporate transactions, product development, corporate governance and executive leadership, qualifies him to serve as a member of our Board of Directors

**Defendant Hoffman**

50.     Defendant Robert E. Hoffman ("Hoffman") served as a Company director from 2014 to June 12, 2017, and served as a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Hoffman beneficially owned 13,756 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Hoffman owned approximately $26,824 worth of MabVax stock.

51.     For the fiscal year ended December 31, 2016, Defendant Hoffman received $59,278 in compensation from the Company. This included $31,500 in fees earned or paid in cash, and $27,778 in option awards.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Hoffman:

> **Robert E. Hoffman, 51,** has served as a member of our Board of Directors since September 2014 and will not be standing for re-election. Mr. Hoffman is Chief Financial Officer and Senior Vice President Finance at Heron Therapeutics (NasdaqCM: HRTX), a position he has held since April 2016. From September 2016 to April 2017 Mr. Hoffman served as Executive Vice President and Chief Financial Officer of Innovus Pharmaceuticals, Inc. From July 2015 to September 2016 Mr. Hoffman was Chief Financial Officer of AnaptysBio, Inc., a biopharmaceutical company.  Prior to AnaptysBio Mr. Hoffman was the Senior Vice President, Finance and Chief Financial Officer of Arena Pharmaceuticals, Inc. (Nasdaq: ARNA) until July 2015 and has held other finance and accounting management roles at Arena since 1997, except that from March 2011 to August 2011, Mr. Hoffman served as Chief Financial Officer for Polaris Group, a privately held drug development company.  Mr. Hoffman is currently a member of the board of directors of CombiMatrix

---

[7] Includes 9,318 shares subject to options exercisable within 60 days of April 18, 2017, and 6,238 common stock warrants purchased in the August 2016 financing transaction.

Verified Shareholder Derivative Complaint

Corporation, a molecular diagnostics company and Kura Oncology, Inc. a biopharmaceutical company. He also currently serves as a member of the Financial Accounting Standards Board's Small Business Advisory Committee and the steering committee of the Association of Bioscience Financial Officers. In addition, Mr. Hoffman is a member and a former director and President of the San Diego Chapter of Financial Executives International. Mr. Hoffman holds a B.B.A. from St. Bonaventure University, and is licensed as a C.P.A. (inactive) in the State of California. We believe Mr. Hoffman's 17 years of experience in serving as an executive officer of a publicly traded life sciences company and service as a member of the board of directors of two life sciences companies qualifies him to serve as a member of our Board of Directors, and as an Audit Committee financial expert.

53.     Upon information and belief, Defendant Hoffman is a citizen of the State of California.

**Defendant Livingston**

54.     Defendant Philip O. Livingston ("Livingston") has served as a Director since the Telik Merger, and prior to that, served as a Director of MabVax Therapeutics Inc. since 2012. Defendant Livingston is also the Company's Chief Science Officer, and helped to establish MabVax Therapeutics Inc. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Livingston beneficially owned 196,286 shares of the Company's common stock, representing 3.05% of outstanding shares on that date.[8] Given that the price

---

[8] Consists of (i) 176,675 shares held by RTP Venture Fund, (ii) 14,885 shares held by Defendant Livingston, (iii) 1,721 shares held by the Joan L. Tweedy 2011 Revocable Trust, or the Tweedy Trust, and (iv) 3,005 shares subject to options exercisable within 60 days of April 18, 2017 held by Defendant Livingston. Voting and dispositive decisions of RTP Venture Fund, LLC are made by Defendant Livingston, and Defendant Livingston is a trustee of the Tweedy Trust.

Verified Shareholder Derivative Complaint

per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Livingston owned approximately $382,757 worth of MabVax stock.

55.     For the fiscal year ended December 31, 2016, Defendant Livingston received $60,000 in compensation from the Company for his role as Chief Science Officer, in the form of cash, and was awarded 700 options.

56.     The Company's 2017 Proxy Statement stated the following about Defendant Livingston:

> **Philip O. Livingston, M.D., 74,** serves as a member of our Board of Directors and our Chief Science Officer and, prior to the Merger, served as a member of the Board of Directors and Chief Science Officer of MabVax Therapeutics, Inc. since 2012. He received his MD degree from Harvard Medical School and was Professor of Medicine in the Joan and Sanford Weill Medical College at Cornell University and Attending Physician and Member in Memorial Sloan-Kettering Cancer Center where he treated melanoma patients and ran the Cancer Vaccinology Laboratory research lab for over 30 years until his retirement from MSK October 1, 2011. Dr. Livingston's research focused on: identification of suitable targets for immunotherapy of a variety of cancers, construction of polyvalent conjugate vaccines specifically designed to augment antibody responses against these targets, and identification of optimal immunological adjuvants to further augment the potency of these vaccines. He has over 108 publications and 4 issued patents and 3 pending patent applications concerning cancer vaccines. Dr. Livingston helped establish MabVax Therapeutics, Inc., and another biotech company, Adjuvance Technologies, Inc. We believe that Dr. Livingston's extensive expertise in immunotherapy qualifies him to serve as a member of our Board of Directors and our Chief Science Officer.

### Defendant Maier

57.     Defendant Paul V. Maier ("Maier") served as a Company director from 2014 until his resignation on July 31, 2018 and was the Chair of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Maier beneficially owned

18

13,080 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Maier owned approximately $25,506 worth of MabVax stock.

58.    For the fiscal year ended December 31, 2016, Defendant Maier received $66,278 in compensation from the Company. This included $38,500 in fees earned or paid in cash, and $27,778 in option awards.

59.    The Company's 2017 Proxy Statement stated the following about Defendant Maier:

> **Paul V. Maier, 69,** joined our Board of Directors in July 2014. Since 2007, Mr. Maier has served as a member of the Board of Directors of International Stem Cell Corporation (OTCQB: ISCO) and currently serves as the Chairperson of its Audit Committee and as a member of its Compensation and Governance Committees. Since 2012 Mr. Maier has served as Chairman of the Audit Committee and a member of the Governance Committee of the Board of Directors of Apricus Biosciences, Inc. (Nasdaq: APRI). Since 2015, Mr. Maier has served as Chairman of the Audit Committee and member of the Compensation Committee of the Board of Directors of Ritter Pharmaceuticals (Nasdaq: RTTR). Mr. Maier also serves as a Director of Biological Dynamics, a private life science company. From 2009 to June 2014, Mr. Maier served as the CFO of Sequenom, Inc., (acquired by Laboratory Corporation of America Holdings). Prior to Sequenom, Inc., Mr. Maier gained executive management experience through various management positions that make him suitable for membership on the Board of Directors of the Company. For example, Mr. Maier served as Senior Vice President and CFO of Ligand Pharmaceuticals, Inc., where he helped build Ligand from a venture stage company to a commercial, integrated biopharmaceutical organization. Prior to Ligand Pharmaceuticals, Inc., he held various management and finance positions at ICN Pharmaceuticals. Mr. Maier received his M.B.A. from Harvard Business School and a B.S. from Pennsylvania State University. We believe that Mr. Maier's over 25 years of experience in life sciences as a chief financial officer and serving on the board

_____

[9] Includes 9,318 shares subject to options exercisable within 60 days of April 18, 2017.

Verified Shareholder Derivative Complaint

of several life sciences public companies qualifies him to serve as a member of the Board of Directors and as chair of the Audit Committee.

**Defendant Ravetch**

60.     Defendant Jeffrey V. Ravetch ("Ravetch") served as a Company Director since the Telik Merger until his resignation on August 3, 2017. Prior to the Telik Merger, Defendant Ravetch had served as a Director of MabVax Therapeutics Inc. since March 2014. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Ravetch beneficially owned 12,404 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Ravetch owned approximately $24,187 worth of MabVax stock.

61.     Defendant Ravetch was also party to a two-year consulting agreement with the Company, under which he received $100,000 in cash compensation per year, starting from January 1, 2016.

62.     For the fiscal year ended December 31, 2016, Defendant Ravetch received $100,412 in compensation from the Company, comprised of $26,000 in fees earned or paid in cash, and $74,412 in stock awards.

63.     The Company's 2017 Proxy Statement stated the following about Defendant Ravetch:

> ***Jeffrey V. Ravetch, M.D., Ph.D., 65,*** serves as a member of our Board of Directors and, prior to the Merger, served as a member of the Board of Directors of MabVax Therapeutics, Inc. since March 2014.  Dr. Ravetch has served as the Theresa and Eugene Lang Professor at the Rockefeller

---

[10] Includes 9,318 shares subject to options exercisable within 60 days of April 18, 2017.

University and Head of the Leonard Wagner Laboratory of Molecular Genetics and Immunology since 1997. Dr. Ravetch, a native of New York City, received his undergraduate training in molecular biophysics and biochemistry at Yale University, earning his B.S. degree in 1973, working with Donald M. Crothers on the thermodynamic and kinetic properties of synthetic oligoribonucleotides. Dr. Ravetch continued his training at the Rockefeller University—Cornell Medical School MD/Ph.D. program, earning his doctorate in 1978 in genetics with Norton Zinder and Peter Model, investigating the genetics of viral replication and gene expression for the single stranded DNA bacteriophage f1 and in 1979 he earned his M.D. from Cornell University Medical School. Dr. Ravetch pursued postdoctoral studies at the NIH with Phil Leder where he identified and characterized the genes for human antibodies and the DNA elements involved in switch recombination. From 1982 to 1996 Dr. Ravetch was a member of the faculty of Memorial Sloan-Kettering Cancer Center and Cornell Medical College. His laboratory has focused on the mechanisms by which antibodies mediate their diverse biological activities in vivo, establishing the pre-eminence of FcR pathways in host defense, inflammation and tolerance and describing novel inhibitory signaling pathways to account for the paradoxical roles of antibodies as promoting and suppressing inflammation. His work extended into clinical applications for the treatment of neoplastic, inflammatory and infectious diseases.

Dr. Ravetch has received numerous awards including the Burroughs-Wellcome Scholar Award, the Pew Scholar Award, the Boyer Award, the NIH Merit Award, the Lee C. Howley, Sr. Prize (2004), the AAI-Huang Foundation Meritorious Career Award (2005), the William B. Coley Award (2007), the Sanofi-Pasteur Award (2012) and the Gairdner International Prize (2012). He has presented numerous named lectures including the Kunkel Lecture, the Ecker Lecture, the Goidl Lecture, the Grabar Lecture, the Dyer Lecture and the Heidelberger/Kabat Lecture. He has received an honorary doctorate from Freidrich-Alexander University, Nuremberg/Erlangen. He is a member of National Academy of Sciences (2006), the Institute of Medicine (2007), a Fellow of the American Academy of Arts and Sciences (2008) and a Fellow of the American Association for the Advancement of Science (2009).

Dr. Ravetch has contributed extensively to the scientific community by serving as a member of the Scientific Advisory Boards of the Cancer Research Institute, the Irvington Institute for Medical Research and the Damon Runyon Foundation. He has been active in biotechnology for the last two decades, having served as a consultant or member of the Scientific Advisory Boards of

Verified Shareholder Derivative Complaint

Millennium Pharmaceuticals, Exelexis Pharmaceuticals, Regeneron Pharmaceuticals, Medimmune, Genentech, Novartis, Merck, Micromet, Xencor, Suppremol, Igenica, Portola Pharmaceuticals and Momenta Pharmaceuticals, Inc. We believe Dr. Ravetch's extensive scientific knowledge and training qualify him to serve as a member of our Board of Directors.

**Defendant Varvaro**

64.     Defendant Thomas C. Varvaro ("Varvaro") served as a Company director from April 3, 2015 until his resignation on July 31, 2018 and served as a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Varvaro beneficially owned 10,902 shares of the Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $1.95, Varvaro owned approximately $21,258 worth of MabVax stock.

65.     For the fiscal year ended December 31, 2016, Defendant Varvaro received $52,812 in compensation from the Company. This included $26,000 in fees earned or paid in cash, and $26,812 in option awards.

66.     The Company's 2017 Proxy Statement stated the following about Defendant Varvaro:

***Thomas C. Varvaro, 47***, has served as a member of our Board of Directors since April 2015.  Mr. Varvaro has served as the CFO of ChromaDex Corp. (Nasdaq: CDXC) since January 2004 and as its Secretary since March 2006. He also has served as a director of ChromaDex Corporation from March 2006 until May 2010. Mr. Varvaro is responsible for overseeing all aspects of ChromaDex's accounting, information technology, intellectual property management and human resources management. Mr. Varvaro has extensive process-mapping and business process improvement skills, along with a solid

---

[11] Includes 7,816 shares subject to options exercisable within 60 days of April 18, 2017.

Verified Shareholder Derivative Complaint

information technology background that includes management and implementation experiences ranging from custom application design to enterprise wide system deployment. Mr. Varvaro also has hands-on experience in integrating acquisitions and in new facility startups. In working with manufacturing organizations, Mr. Varvaro has overseen plant automation, reporting and bar code tracking implementations. Mr. Varvaro also has broad legal experience in intellectual property, contract and employment law. Prior to ChromaDex, Mr. Varvaro gained substantial management experience in several positions that make him suitable for membership on the Board of Directors of the Company.  For example, he was employed by Fast Heat Inc., a Chicago, Illinois based Global supplier to the plastics, HVAC, packaging, and food processing industries, where he began as controller and was promoted to chief information officer and then chief financial officer during his tenure. During his time there Mr. Varvaro was responsible for all financial matters including accounting, risk management and human resources. Earlier in his career Mr. Varvaro gained additional experience in other areas of information technology and accounting roles.  For example, Mr. Varvaro was employed by Maple Leaf Bakery, Inc., Chicago, Illinois, during its rise to becoming a national leader in specialty bakery products. During his tenure, Mr. Varvaro served in information technology and accounting roles, helping to shepherd the company from a single facility to national leader in specialty food products. Mr. Varvaro has a B.S. in Accounting from University of Illinois, Urbana-Champaign and is a Certified Public Accountant.  We believe Mr. Varvaro's extensive industry experience as an officer and director, as well as his extensive financial and accounting training and management experience qualify him to serve as a member of our Board of Directors, and as an Audit Committee financial expert.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67.    By reason of their positions as officers and/or directors of MabVax and because of their ability to control the business and corporate affairs of MabVax, the Individual Defendants owed MabVax and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MabVax in a fair, just, honest, and equitable manner. The Individual

Verified Shareholder Derivative Complaint

Defendants were and are required to act in furtherance of the best interests of MabVax and its shareholders so as to benefit all shareholders equally.

68.     Each director, officer, and controller of the Company owes to MabVax and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MabVax, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of MabVax were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MabVax, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the

24

Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MabVax's Board at all relevant times.

72.     As senior executive officers, directors, and controllers of a publicly-traded company the common stock of which was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it improperly failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Moreover, the Company's directors had a duty not to cause the Company to waste corporate assets by engaging in the Reporting Misconduct, which resulted in an SEC investigation.

73.     To discharge their duties, the officers and directors of MabVax were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MabVax were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to MabVax's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MabVax conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MabVax and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MabVax's operations would comply with all applicable laws and MabVax's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.    Each of the Individual Defendants further owed to MabVax and the shareholders the duty of loyalty requiring that each favor MabVax's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.    At all times relevant hereto, the Individual Defendants were the agents of each other and of MabVax and were at all times acting within the course and scope of such agency.

76.    Because of their advisory, executive, managerial, directorial, and controlling positions with MabVax, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MabVax.

Verified Shareholder Derivative Complaint

## <u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein and caused the Company to waste corporate assets by engaging in the Reporting Misconduct. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (3) engage in the Reporting Misconduct; and (4) artificially inflate the Company's stock price.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The Individual Defendants also caused the Company to waste corporate assets by engaging in the Reporting Misconduct. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the

actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of MabVax was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MabVax, and was at all times acting within the course and scope of such agency.

## MABVAX'S CODE OF CONDUCT

83.     The Company's Code of Conduct (the "Code" or "Code of Conduct") states that it "applies to all subsidiaries, employees and directors of, and consultants to, MabVax."

84.     The Code of Conduct states that its purpose "is to promote, among other things":

- Compliance with applicable laws, rules and regulations;

• Honest and ethical conduct including, and the ethical handling of actual or potential conflicts of interest;

• The safeguarding of confidential information and the Company's assets;

• Complete, accurate and timely reporting of the Company's financial condition and results of operations including disclosures made in documents filed with, or furnished to, the SEC and in other public communications and complete and accurate recordkeeping;

• A healthy work environment that promotes work force diversity and is free of harassment and discrimination; and

• The prompt internal reporting and investigation of violations of this Code.

85.    The Code of Conduct provides, as to "Legal Compliance," that:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each person's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their area of responsibility. If you do have a question in the area of legal compliance, it is important that you seek answers from your supervisor or the Compliance Officer (as described in the last section of this document, below).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject you, as well as MabVax, to civil and/or criminal penalties. Conduct and records, including emails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation.

86.    The Code of Conduct provides, regarding "Maintenance of Corporate Books, records, Documents and Accounts," that:

Each employee must ensure that all MabVax documents are completed accurately, truthfully, in a timely manner, and, when applicable, are properly authorized.

Financial activities are to be recorded in compliance with all applicable laws and generally-accepted accounting practices. To ensure that accurate financial and administrative information is maintained, you should not permit or take

Verified Shareholder Derivative Complaint

any action that would result in the inaccurate recording of entries in MabVax's books, records and ledgers. ***We require that***:

> • no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;
>
> • transactions be supported by appropriate documentation;
>
> • the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and our books and records reflect such documentation and be accurate and complete;
>
> • ***all employees comply with our system of internal controls***; and
>
> • no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

(Emphasis added.)

87.    The Code of Conduct continues, emphasizing the importance of accurate reporting:

> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations in all material respects. ***All persons who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about MabVax that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.*** In addition:
>
> • no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

31

• all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our statements and reports filed with the SEC, are accurate and complete; and

• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our statements and reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our statements and reports accurate in all material respects.

***Any person who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly*** to a supervisor, the Compliance Officer or one of the other compliance resources described in the last section below.

(Emphasis added.)

88.     Regarding "Honesty with Regulators and Other Government Officials," the Code of Conduct provides, in relevant part: "Because MabVax is subject to a variety of government regulations, particular care must be taken to ensure that no inaccurate or misleading reports, certifications, claims or statements are made to any government agency or official."

89.     The Code of Conduct provides, as to "Compliance with the Code of Conduct," in relevant part:

We have established the position of Compliance Officer to oversee our legal compliance and ethics program. The Compliance Officer is a person to whom you can address questions or concerns, complaints or observations regarding suspected Code violations, although, as discussed below, you should first discuss all such issues with your supervisor, unless that is impossible or inappropriate under the circumstances**. *The Compliance Officer, David Hansen, CEO*, can be reached at extension 301 or by e-mail. If it is impossible

or inappropriate to discuss the matter with the Compliance Officer, you may contact our outside counsel, Jeremy Glaser of Mintz, Levin at 858.314.1515. In addition to fielding questions, concerns, complaints or observations regarding suspected Code violations, the Compliance Officer *is responsible for*:

• *investigating possible violations of the Code*;

• training new employees in Code policies and obtaining acknowledgments that each new employee has read and understands the Code;

• conducting training sessions and distributing to employees copies of the Code as appropriate with a reminder that they are responsible for reading, understanding and complying with the Code;

• obtaining annual acknowledgments from each employee that he or she has read and understands the Code;

• updating the Code as needed (and alerting employees to any such update), with appropriate approval of the Audit Committee, to reflect changes in the law, operations and in recognized best practices; and

• otherwise promoting an atmosphere of responsible and ethical conduct.

The Compliance Officer will investigate all reported possible Code violations promptly and confidentially as appropriate under the specific circumstances.

Your most immediate resource for any matter related to the Code is your supervisor. He or she may have the information you need or may be able to refer the question to another appropriate source. There may, however, be times when you prefer not to go to your supervisor. In these instances, you should feel free to discuss your concern with the Compliance Officer. If you are uncomfortable speaking with the Compliance Officer because he or she works in your department or is one of your supervisors, please contact our outside counsel as detailed above. In addition*, if your concern involves potential misconduct and relates to questionable accounting, internal controls or auditing matters, you may report directly to the Audit Committee* as set forth below and in our separate policy "Policy for Complaints Related to Accounting and Audit Matters".

(Emphasis added.)

90.     The Code of Conduct provides, as to "Accounting, Internal Controls and Auditing Matters," that:

> You should inform the Compliance Officer of any concerns, complaints or observations regarding questionable accounting, internal accounting controls or auditing matters (collectively "Accounting Matters") including any concerns or complaints regarding retaliation for reporting concerns, complaints or observations regarding Accounting Matters. If you report any concerns, complaints or observations regarding Accounting Matters to the Compliance Officer, the Compliance Officer shall promptly inform the Audit Committee of our Board of Directors. You may also report any concerns, complaints or observations regarding Accounting Matters directly to the Audit Committee as detailed in our separate "Policy for Complaints Related to Accounting and Audit Matters." Reported concerns and complaints regarding Accounting Matters will be investigated promptly and confidentially as appropriate based on the specific circumstances.

91.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and Reporting Misconduct. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## MABVAX'S ACCOUNTING POLICY

92.     As reflected in the Code of Conduct, the Company's maintains a "Policy for Complaints Relating to Accounting and Audit Matters" (the "Accounting Policy") which

states that "[a]ll employees, officers and directors have a responsibility to guard against and report unethical or otherwise improper business practices and actions, including but not limited to questionable accounting and auditing matters."

93.    According to the Accounting Policy, the Audit Committee of the Board established "procedures for the receipt, retention and handling of complaints regarding accounting and related practices, internal accounting controls or auditing matters (collectively 'Accounting Complaints')," and "[a]ny employee, agent, auditor, consultant, advisor, officer or director of the Company may submit a good faith Accounting Complaint to the management of the Company or on an anonymous confidential basis, and without fear of dismissal or retaliation of any kind."

94.    The Accounting Policy covers, among other things:

2.1 Fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company.

2.2 Fraud or deliberate error in the recording and maintaining of financial records of the Company.

2.3 Deficiencies in or noncompliance with the Company's internal accounting controls.

2.4 Material misrepresentation or false statement to or by a senior officer or accountant regarding a matter contained in the financial records or audit reports, or an auditing, internal accounting controls or accounting matter contained in the financial reports of the Company.

2.5 Misrepresentation or omission of material facts in the reporting of the Company's financial condition.

# MABVAX'S AUDIT COMMITTEE CHARTER

95.     The Company's has adopted an Audit Committee Charter, which establishes that:

> The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Board of Directors (the "Board") of MabVax Therapeutics Holdings, Inc. (the "Company") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal accounting and financial controls and audits of financial statements, the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors").

96.     The Audit Committee Charter Provides that the responsibilities of the Audit Committee include:

> **5. Audited Financial Statement Review.** To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend whether or not such financial statements should be so included.
>
> **6. Annual Audit Results.** To discuss with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards.
>
> **7. Quarterly Results.** To review, discuss with management and the Auditors and approve the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards.

Verified Shareholder Derivative Complaint

**8. Management's Discussion and Analysis.** To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**9. Press Releases.** To review, discuss with management and the Auditors, and approve as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

97.     The responsibilities of the Audit Committee include the following with respect to internal controls over financial reporting and disclosure controls:

**16. Internal Control Over Financial Reporting.** To confer with management and the Auditors regarding the scope, adequacy and effectiveness of internal control over financial reporting including any special audit steps taken in the event of material control deficiencies.

**17. Disclosure Controls.** Review with management and the independent auditors the Company's disclosure controls and procedures, including any material issues regarding the efficacy of or deficiencies in the controls.

98.     Finally, the responsibilities of the Audit Committee also include the following:

**19. Correspondence with Regulators.** To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**20. Complaint Procedures.** To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal

37

Verified Shareholder Derivative Complaint

accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**21. Regulatory and Accounting Initiatives.** To review with management, counsel and the Auditors, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

**22. Ethical Compliance.** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Conduct, including review and approval of related-party transactions as required by the Nasdaq rules, review of updates to the Code of Conduct and review of policies regarding the hiring of former employees of the Auditors.

**23. Investigations.** To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

**24. Proxy Report.** To prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

99.     In violation of the Audit Committee Charter, Defendants Varvaro, Cohen, Maier and Hoffman failed to, among other things, adequately review audited financial statements, effectively confer with management regarding disclosure controls and internal controls over financial reporting, or review management's efforts to ensure ethical compliance.

Verified Shareholder Derivative Complaint

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

100.   MabVax is a clinical stage biopharmaceutical company that discovers, develops, and commercializes proprietary human monoclonal antibody products and vaccines for the treatment of various cancers.

101.   On July 8, 2014 MabVax Therapeutics Inc. merged with Telik, Inc.

102.   During the Relevant Period, the Company sought to uplist its common stock from OTC markets to the NASDAQ. In order to meet and maintain NASDAQ listing standards, the Company both engaged in reverse stock splits to achieve the minimum bid price of $1.00 per share, and issued securities to meet the $2.5 million stockholders' equity minimum.

103.   Ultimately, the Company was able to meet the listing requirements and its common stock was listed on the NASDAQ from August 17, 2016, until the Company was delisted on July 11, 2018 for failing to meet the $2.5 million stockholder's equity threshold and failing to timely file periodic reports with the SEC.

### Weak Internal Controls and Stock Financing Transactions

104.   The Individual Defendants have caused and permitted material weakness in the Company's material weakness in its internal controls over its financial reporting since the Telik Merger, of which the Individual Defendants were aware. For example, the Company subsequently reported material weakness in its internal controls over financial reporting when the following statements had been issued:

a) Form 10-Q for the period ended September 30, 2014 filed with the SEC on November 14, 2014;

b) Form 10-K for the quarter and year ended December 31, 2014 filed with the SEC on March 31, 2015;

c) Form 10-Q for the quarter ended March 31, 2015 filed with the SEC on May 15, 2015;

d) Form 10-Q for the quarter ended June 30, 2015 filed with the SEC on August 10, 2015; and

e) Form 10-Q for the quarter ended September 30, 2015 filed with the SEC on October 30, 2015.

All of the above filings were signed by Defendants Hansen and Hanson.

**The Pump & Dump Misconduct**

105.   Upon information and belief, MabVax is the Company referred to as Company C in the SEC Action.

106.   Frost co-owns FGIT, and is the Chairman, CEO, and controlling shareholder of OPKO.

107.   The Frost Conspirators have collectively invested hundreds of millions of dollars in various entities, including MabVax. At certain times during the Relevant Period, the stakes of individual Frost Conspirators were greater than 5% of the Company's outstanding stock.

108.   During much of the Relevant Period, the collective holdings of the Frost Conspirators exceeded 5% of the Company's outstanding stock.

109.   The Frost Conspirators made numerous filings during the Relevant Period disclosing their holdings of MabVax while failing to disclose that they were operating as a group, including:

| Date | Conspirator(s) | Filing | % Outstanding Common Stock |
|---|---|---|---|
| 12/31/2015 | Frost & FGIT | Schedule 13G/A | 4.99% |
| 12/31/2016 | Frost & FGIT | Schedule 13G/A | 6.71% |
| 12/31/2016 | Honig | Schedule 13G | 6.22% |
| 1/24/2017 | Brauser | Schedule 13G | 5.44% |
| 9/11/2017 | Stetson & HS Contrarian Investments | Schedule 13G | 5.64% |
| 12/31/2017 | Frost & FGIT | Schedule 13G/A | 4.99% |
| 2/12/2018 | Honig | Schedule 13G | 4.99% |
| 2/12/2018 | Stetson & HS Contrarian Investments | Schedule 13G | 4.99% |
| 7/24/2018 | Stetson & HS Contrarian Investments | Schedule 13G | 4.99% |
| 8/6/2018 | Honig | Schedule 13G | 4.99% |

110.   With regard to the close business associations among the Frost Conspirators, the Individual Defendants either knew or were reckless in not knowing that the Frost Conspirators had jointly participated in numerous other investments.

111.   Indeed, the SEC Action alleges that Company C's CEO explicitly deferred to Honig in determining who may invest in MabVax. According to the SEC Action, Company C's CEO sent an email to Honig regarding a financing round occurring in March 2015, on March 19, 2015 stating "[h]e might be another party you might want to allow to invest with the current group. Viewed as your choice not mine. That is why I asked him to call you."

112.   Further, the SEC Action alleges that Honig and Stetson directed the business choices of Company C. For example, Honig and Stetson directed Company C's CEO to name certain individuals to Company C's board, directed Company C's choice of legal counsel **and Company C's choice of public relations firm**.

113.   MabVax's choice of public relations firm was directly tied to the Pump & Dump Misconduct. In order to artificially inflate share prices, the Frost Conspirators commissioned articles promoting MabVax. These articles specifically touted investments made by Frost and OPKO for the purpose of promoting MabVax. For example:

(a) On April 8, 2015, an article was published on the website *Seeking Alpha* titled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics." The article, published under the pseudonym Wall Street Advisors, pointed to Frost and OPKO's MabVax investment to promote and inflate the price of MabVax securities in light of Frost's reputation as a successful biotech investor.

(b) On July 1, 2015, John H. Ford published an article on the website *Seeking Alpha* titled "MabVax: Near-Term Catalysts Could Push Shares From $2 To Over $5." The article pointed to Frost and OPKO's MabVax investment to promote and inflate

the price of MabVax securities in light of Frost's reputation as a successful biotech investor. For example, the article stated, in relevant part:

### Dr. Phillip Frost and Opko investments validate MabVax's technology

***One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's (NYSEMKT:OPK),[ ]recent investment in the company***. Dr. Frost and Opko were the lead investor's [sic] in an $11.7 million deal. Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology.

One of the most important questions for investors is whether or not MabVax's technology works. Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative. In other words, ***Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid***.

I first became aware of Dr. Frost when I wrote about his flagship company Opko. At the time of my first Opko article, the shares were trading at $4, and have since risen above $19. ***Opko is a great company, and its involvement with MabVax will be positive for MabVax***.

Another example of Dr. Frost's success includes his investment in Cocrystal Pharma (OTC:COCP) at $.30 per share. Co[c]rystal has traded above $1.50 this year, providing more than a 5X return. I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performers.

(Bold heading in original. Bold & italic emphasis added.)

114.   The price per share of MabVax common stock responded favorably to the above-referenced articles. For example, in response to the April 8, 2015 *Seeking Alpha* article, the price per share of MabVax stock rose from a closing price of $1.91 per share on April 1, 2015 to close at $4.30 per share on April 9, 2015.

115.   Following the publication of these articles, the Frost Conspirators dumped shares upon the market at artificially inflated prices en masse, enriching themselves at the

expense of unsuspecting investors. The SEC Action alleges that certain defendants in the SEC Action sold MabVax shares between April 6 and June 30, 2015, netting proceeds in excess of $5.62 million, and sold MabVax shares between July 1 and December 31, 2018, netting proceeds in excess of $2.75 million.

116.   By allowing the Frost Conspirators to direct the Company's business decisions, including choice of public relations firm and legal counsel, as well as turning a blind eye to the Frost Conspirator's operating as a group with respect to their shareholdings, the Individual Defendants breached their fiduciary duties and were unjustly enriched by engaging in the Pump & Dump Misconduct.

117.   In addition to the SEC Action, the Frost Conspirators' actions have led to the filing of multiple securities class actions against OPKO and Frost pending in United States District Court for the District of New Jersey and United States District Court for the Southern District of New York.

**False and Misleading Statements**

118.   On June 30, 2014, the Company filed a Schedule 14A with the SEC providing additional details of the proposed Telik Merger (the "Merger Proxy"). With respect to holdings of the common stock of the post-merger entity, the Merger Proxy stated, in relevant part:

> The shares of Telik's common stock held by MabVax's equityholders upon closing of the merger (excluding any shares of Series B preferred stock and the PIPE warrants (assuming the conversion into common stock of such warrants) issued in the PIPE transaction) would represent approximately 85%, and shares of Telik's common stock held by Telik's current equityholders are

44

expected to represent approximately 15%, of the Telik capital stock. **Including the shares of Series B preferred stock and PIPE warrants (assuming a 1 for 1 conversion into common stock of such warrants) issued in the PIPE transaction, Telik's equity holders other than the holders of the Series B preferred stock and PIPE warrants are expected to hold shares of common stock representing approximately 12% of the Telik capital stock.** However, if Telik's common stock is delisted from the NASDAQ Capital Market, MabVax's equityholders will own approximately 95%, and Telik's current equityholders will own approximately 5%, of the Telik capital stock immediately following the merger. At the effective time of the merger, each share of MabVax's common stock will be converted into and exchanged for the right to receive a number of shares of Telik's common stock equal to the exchange ratio calculated in accordance with the merger agreement.

119.   The Merger Proxy also provided the following background of the Telik Merger:

In 2013, the FDA approved a Phase 3 trial design for Telik's lead drug candidate, Telintra. Because Telik's resources were insufficient to fund further development of Telintra®, in March 2013, Telik engaged Needham & Company, LLC, or Needham, to provide assistance and counsel in identifying and engaging potential investors or strategic partners to advance the Telintra program. During the period from March 2013 to March 10, 2014, Needham contacted approximately 115 potential investors and partners, of which approximately 74 were financial investors and approximately 41 were strategic investors. Telik entered into nondisclosure agreements with 16 of these entities and shared information concerning its research with most of the signatory companies pursuant to the nondisclosure agreements. **Of those 16 companies, 10 were financial investors and 6 were strategic investors.** Needham's outreach was supplemented by contacts and relationships developed by Telik's management and board, and by Telik's external business development advisor. Discussions with each of the companies contacted focused on financing Telik's potential Phase 3 trial of Telintra that had been approved by the U.S. Food and Drug Administration, licensing arrangements concerning the Telintra program, a business combination, or some blend of the foregoing. Regarding the financial investors, the lack of interest was mostly due to their perception that Telik's Phase 2 clinical trial data with respect to the study of the oral formulation of Telintra provided insufficient evidence to warrant the financial risk of funding

a full Phase 3 clinical trial pursuant to the proposed protocol. Regarding the strategic investors, the lack of interest was mostly due to reasons specific to their strategic priorities.

On February 18, 2014, Telik's counsel received a telephone call from a representative of certain potential investors that later participated in the PIPE transaction, or the Investors, requesting counsel convey to Telik the investors' interest in initiating potential strategic discussions. Telik's counsel conveyed such message to Telik. On February 24, 2014, a representative of Hudson Bay described to Michael M. Wick, Telik's President and Chief Executive Officer, the outline of a potential merger involving an undisclosed, oncology-based biotechnology company and, later that day, representative of Hudson Bay provided to Dr. Wick a form of nondisclosure agreement to enable further discussion.

On February 27, 2014, following a discussion, Telik and Hudson Bay signed a mutual nondisclosure agreement. Later that day, Dr. Wick provided to Hudson Bay a summary of Telik's research programs and business and discussed the summary and proposed merger with a representative of Hudson Bay in greater detail.

120.   The Merger Proxy continued, discussing MabVax's and Defendant Hansen's and Hanson's involvement in the Telik Merger:

On March 5, 2014, representatives of Hudson Bay met with J. David Hansen, MabVax's Chief Executive Officer **and a founder,** and Gregory Hanson, MabVax's Chief Financial Officer, and discussed the potential merger. On the same day, a representative of Hudson Bay introduced Dr. Wick to Messrs. Hansen and Hanson by email.

On March 7, 2014, Dr. Wick spoke with Mr. Hansen by telephone about the potential merger. **Each described his respective company, and each agreed to continue the discussion under a nondisclosure agreement.** Following the call, Mr. Hansen provided to Dr. Wick a form of nondisclosure agreement between Telik and MabVax that would facilitate further discussion, and the parties signed a mutual nondisclosure agreement later the same day.

On March 13, 2014, Mr. Hansen proposed to Dr. Wick a draft, non-binding term sheet for a possible merger transaction between Telik and MabVax. The term sheet included the structure and certain preliminary terms of the merger, including equity consideration, the board composition of the combined

46

company, and a potential consulting arrangement with Dr. Wick, as well as exclusivity, termination, expenses, and other customary provisions. **The equity consideration in the term sheet proposed that Telik equityholders would hold approximately 12% of the combined company, while MabVax equityholders would receive shares in the merger representing approximately 88%.**

On March 14, 2014, Messrs. Hansen and Hanson met in person with Telik's management team at Telik's facility in Palo Alto, California. At this meeting, **Mr. Hansen raised the potential that Dr. Wick become a member of the Board of Directors of the proposed new entity should the parties agree on a merger so that Dr. Wick could transfer knowledge of Telintra to the new entity and draw upon his board and oncology development experience to consult with the new entity. Dr. Wick and Mr. Hansen did not discuss compensation for such a Board position, but Dr. Wick presumed that such compensation would be the same as the compensation other directors of the new entity would receive and might include stock options.** The March 14 meeting was attended by, on behalf of Telik, Dr. Wick, Steven R. Schow, Telik's Vice President, Research, Wendy K. Wee, Telik's Vice President, Finance and Controller, and William P. Kaplan, Telik's Vice President, General Counsel and Corporate Secretary. At the meeting, Dr. Wick reviewed Telik's business and Telintra development program, and Mr. Hansen reviewed the business and clinical development programs of MabVax. The parties discussed the respective research programs and the general parameters of the potential merger, **including the possibility that the combined entity would be able to take advantage of the potential benefits resulting from the combination of the Telik public company infrastructure. Also at the meeting, Dr. Wick informed Messrs. Hansen and Hanson that the equity split was not acceptable to Telik and countered with a proposal in which Telik equityholders would receive approximately 15%, while MabVax equityholders would receive shares representing approximately 85%.**

121.   On August 8, 2014 the Company filed its quarterly report for the quarter ended July 30, 2014 on Form 10-Q (the "2014 Q2 10-Q") with the SEC, signed by Defendants Hansen and Hanson. The 2014 Q2 10-Q stated the following regarding the Company's internal controls and procedures:

*Evaluation of disclosure controls and procedures*. Our management, with the participation of our President and Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2014. Based on such evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that, subject to limitations described below, our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), were effective as of June 30, 2014.

*Changes in internal control over financial reporting*. As discussed above, we completed the Merger on July 8, 2014 and we are currently in the process of evaluating and integrating internal controls over financial reporting of the parties to the Merger. During the quarter ended June 30, 2014, other than the changes to our internal control process resulting from the Merger, there were no changes in our internal controls over financial reporting identified in management's evaluation pursuant to Rule 13a-15(d) of the Exchange Act during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

122.   Attached to the 2014 Q2 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hansen and Hanson attesting to the accuracy of the 2014 Q2 10-Q.

123.   On September 29, 2014, the Company filed a registration statement on Form S-1 (the "September 2014 S-1"). The September 2014 S-1 was signed by Defendants Hansen, Hanson, Cohen, Hoffman, Livingston, Maier, and Ravetch.

124.   The September 2014 S-1 contained the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[12]

_____

[12] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

Beneficial ownership is determined in accordance with the rules of the SEC and includes voting or investment power with respect to the securities. . . .

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock | |
|---|---|---|---|
| **5% Stockholders** | | | |
| RTP Venture Fund (1) | 445,473 | 24.19 | % |
| Biomark Capital Fund IV, L.P. (9) | 197,641 | 10.82 | % |
| Total 5% stockholders | 643,114 | 34.80 | % |
| **Directors and Executive Officers** | | | |
| J. David Hansen (2) | 89,624 | 4.85 | % |
| Gregory P. Hanson | — | * | |
| Philip O. Livingston, M.D. (1) | 445,473 | 24.19 | % |
| Robert E. Hoffman (3) | 11,116 | * | |
| Jeffrey Ravetch, M.D., Ph.D. (4) | 11,116 | * | |
| Wolfgang W. Scholz, Ph.D. (5) | 63,918 | 3.47 | % |
| Michael M. Wick, M.D., Ph.D. (6) | 13,746 | * | |
| Paul V. Maier (7) | 11,116 | * | |
| Kenneth M. Cohen (8) | 11,116 | * | |
| Paul W. Maffuid, Ph.D. | — | * | |
| All executive officers and directors as a group (9 persons) | 964,881 | 52.52 | % |

\* Less than 1%.

125.   On October 14, 2014, the Company filed an amended registration statement on Form S-1/A amending the September 2014 S-1 (the "October 2014 S-1/A"). The October 2014 S-1/A registered 1,615,070 shares of common stock at a proposed price of $4.88 per share. The October 2014 S-1/A was signed by Defendants Hansen and Hanson and by Defendant Hansen as attorney-in-fact for Defendants Cohen, Hoffman, Livingston,

49

Verified Shareholder Derivative Complaint

Maier, and Ravetch. The October 2014 S-1/A was declared effective by the SEC on November 12, 2014.

126. The October 2014 S-1/A contained the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[13]

Beneficial ownership is determined in accordance with the rules of the SEC and includes voting or investment power with respect to the securities. . . .

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| RTP Venture Fund (1) | 445,473 | 20.26% |
| Biomark Capital Fund IV, L.P. (9) | 197,901 | 9.07% |
| | | |
| Total 5% stockholders | 643,374 | 29.33% |
| | | |
| **Directors and Executive Officers** | | |
| J. David Hansen (2) | 90,145 | 4.09% |
| Gregory P. Hanson | — | * |
| Philip O. Livingston, M.D. (1) | 445,473 | 20.26% |
| Robert E. Hoffman (3) | 11,116 | * |
| Jeffrey Ravetch, M.D., Ph.D. (4) | 11,116 | * |
| Wolfgang W. Scholz, Ph.D. (5) | 64,265 | 2.92% |
| Michael M. Wick, M.D., Ph.D. (6) | 13,746 | * |
| Paul V. Maier (7) | 11,116 | * |
| Kenneth M. Cohen (8) | 11,116 | * |
| Paul W. Maffuid, Ph.D. | — | * |
| | | |
| **All executive officers and directors as a group (10 persons)** | 658,093 | 29.93% |

\* Less than 1%.

---

[13] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

127.   On November 12, 2014, the Company filed a prospectus on Form 424B3 (the "November 12, 2014 Prospectus") relating "to the resale of up to 1,615,070 shares of our common stock consisting of 1,615,070 shares of common stock issuable upon conversion of shares of [MabVax's] Series A-1 Preferred Stock . . ." The November 12, 2014 Prospectus contained the same statements regarding security ownership as contained in the October 2014 S-1/A and reproduced above.

128.   On April 30, 2015, the Company filed an amendment to its 2014 10-K on Form 10-K/A (the "2014 10-K/A"). The 2014 10-K/A was signed by Defendants Hansen, Hanson, Cohen, Hoffman, Livingston, Maier, Ravetch, and Varvaro.

129.   The 2014 10-K/A included the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[14]

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| ᵃ Stockholders | | |
| RTP Venture Fund (1) | 1,447,037 | 6.45% |
| Frost Gamma Investment Trust (2) | 1,333,333 | 5.95% |
| Pinnacle Family Office Investments | 1,333,333 | 5.95% |
| Andy Sassine | 1,333,333 | 5.95% |
| Alpha Capital Anstalt | 1,332,313 | 5.94% |
| **Total 5% stockholders** | 6,779,349 | 30.24% |
| | | |

---

[14] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| Directors and Executive Officers | | |
|---|---|---|
| Philip O. Livingston, M.D. (1) | 1,447,037 | 6.45% |
| Jeffrey Ravetch, M.D., Ph.D. (5) | 142,616 | * |
| J. David Hansen (3) | 93,271 | * |
| Wolfgang W. Scholz, Ph.D. (6) | 66,350 | * |
| Robert E. Hoffman (4) | 21,116 | * |
| Kenneth M. Cohen (8) | 17,616 | * |
| Paul V. Maier (7) | 11,116 | * |
| Gregory P. Hanson | 9,079 | * |
| Paul W. Maffuid, Ph.D. | 5,000 | * |
| Thomas C. Varvaro | — | * |
| executive officers and directors as a group (11 persons) | 1,813,201 | 8.05% |

\* Less than 1%.

130.   On May 15, 2015 the Company filed its quarterly report for the quarter ended March 31, 2015 on Form 10-Q (the "2015 Q1 10-Q") with the SEC, signed by Defendants Hansen and Hanson. Regarding a then-recent financing transaction, the 2015 Q1 10-Q stated, in relevant part:

On March 31, 2015 and April 10, 2015, the Company closed on a financing transaction by entering into separate subscription agreements (the "Subscription Agreements") with accredited investors (the "Investors") relating to the issuance and sale of an aggregate of $11,714,501 of units (the "Units") at a purchase price of $0.75 per Unit, with each Unit consisting of one share of the Company's common stock, par value $0.01 per share (or, at the election of any Investor who, as a result of receiving common stock would hold in excess of 4.99% of the Company's issued and outstanding common stock, shares of the Company's newly designated 0% Series E Convertible Preferred Stock and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share, as further described in the Notes to Financial Statements – Equity, (the "Private Placement").

131.    Attached to the 2015 Q1 10-Q were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

132.    On July 7, 2015, the Company filed a Schedule 14A filed with the SEC (the "2015 Proxy Statement"). The 2015 Proxy Statement included the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[15]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 25,981,075 shares of Common Stock outstanding on the date above, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **Stockholders** | | |
| RTP Venture Fund (1) | 1,447,299 | 5.59% |
| Frost Gamma Investment Trust (2) | 1,333,333 | 5.15% |
| Pinnacle Family Office Investments | 1,333,333 | 5.15% |
| Andy Sassine | 1,333,333 | 5.15% |
| Alpha Capital Anstalt | 1,332,313 | 5.15% |
| **Total 5% stockholders** | 6,779,611 | 26.19% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 1,447,299 | 5.59% |
| Jeffrey Ravetch, M.D., Ph.D. (5) | 142,616 | * |
| J. David Hansen (3) | 94,837 | * |
| Wolfgang W. Scholz, Ph.D. (6) | 67,394 | * |
| Robert E. Hoffman (4) | 21,116 | * |
| Kenneth M. Cohen (8) | 21,116 | * |
| Paul V. Maier (7) | 16,116 | * |
| Gregory P. Hanson (9) | 10,295 | * |
| Paul W. Maffuid, Ph.D. (10) | 8,474 | * |

---

[15] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| | | |
|---|---|---|
| Thomas C. Varvaro | — | * |
| **All executive officers and directors as a group (ten persons)** | 1,829,263 | 7.03% |

\* Less than 1%.

133. On August 10, 2015 the Company filed its quarterly report for the quarter ended June 30, 2015 on Form 10-Q (the "2015 Q2 10-Q") with the SEC, signed by Defendants Hansen and Hanson. Regarding a common stock financing, the 2015 Q2 10-Q stated, in relevant part:

> On March 31, 2015, the Company entered into the Private Placement and sold $4,714,726 of Units, net of $281,023 in issuance costs, consisting of 6,661,000 shares of common stock and warrants to purchase 3,330,500 shares of common stock at $1.50 a share. The Units were sold at a price of $0.75 per Unit.

> On April 10, 2015, the Company completed the closing of the Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of investment consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

> The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 between March 25, 2015, and April 10, 2015, in connection with the Private Placement.

> ***OPKO Health, Inc. ("OPKO") was the lead investor in the Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock***.

> As a condition to the Series E preferred stock investment in the Private Placement, each of the other investors in the Private Placement agreed to execute the Lockup Agreement in favor of the Company, restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the Private Placement.

(Emphasis added.)

134.   The 2015 Q2 10-Q continued, stating:

On June 30, 2015 the Company and the [OPKO] representative entered into a letter agreement pursuant to which the Company granted the representative the right, but not the obligation, until June 30, 2016, to nominate and appoint up to two additional members of the Company's board of directors (the "Board" or the "Board of Directors"), or to approve the person(s) nominated by the Company pursuant to the agreement in consideration for the release of the escrowed funds. The nominees will be subject to the satisfaction of standard corporate governance practices and any applicable national securities exchange requirements. Upon signing the agreement, the escrowed funds were released to the Company.

For purchasers who would hold 5% or more of the Company's common stock by entering into the Private Placement, they were entitled to elect instead of common stock, shares of the Company's Series E Convertible preferred stock, par value $0.01 per share (the "Series E preferred stock") convertible into an equivalent number of shares of such common stock. The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

135.   Attached to the 2015 Q2 10-Q were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

136.   On September 28, 2015, the Company filed an amended registration statement on Form S-1/A amending its Form S-1 filed on June 8, 2015 (the "September 2015 S-1/A"). The September 2015 S-1/A offered "2,189,781 shares of its common stock and warrants to purchase up to an aggregate of 1,094,891 shares of common stock." The

September 2015 S-1/A was signed by Defendants Hansen and Hanson, and by Defendant Hansen for Defendants Cohen, Hoffman, Livingston, Maier, Ravetch, and Varvaro. The September 2015 S-1/A was declared effective by the SEC on September 30, 2015.

137.   The September 2015 S-1/A contained the following table which purported to show the security ownership of certain beneficial owners and management:[16]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 25,891,072 shares of common stock outstanding on the date above, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| RTP Venture Fund (1) | 1,448,081 | 5.59% |
| Frost Gamma Investment Trust (2)** | 1,381,667 | 5.34% |
| Pinnacle Family Office Investments (3) | 1,333,333 | 5.15% |
| Andy Sassine (4) | 1,333,332 | 5.15% |
| Alpha Capital Anstalt (5)** | 1,332,313 | 5.15% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 1,448,081 | 5.59% |
| Jeffrey Ravetch, M.D., Ph.D. (8) | 142,616 | * |
| J. David Hansen (6) | 95,358 | * |
| Wolfgang W. Scholz, Ph.D. (9) | 67,741 | * |
| Robert E. Hoffman (7) | 21,116 | * |
| Kenneth M. Cohen (11) | 21,116 | * |
| Paul V. Maier (10) | 16,116 | * |
| Gregory P. Hanson (12) | 10,700 | * |
| Paul W. Maffuid, Ph.D. (13) | 8,763 | * |

---

[16] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| | | |
|---|---|---|
| Thomas C. Varvaro | — | * |
| **All executive officers and directors as a group (10 persons)** | 1,831,607 | 7.04% |

\* Less than 1%.

\*\*Based solely on the holder's filing with the Securities and Exchange Commission on Schedule 13G

138.   On September 30, 2015, the Company filed a prospectus on Form 424B4 (the "September 2015 Prospectus") "offering 2,500,000 shares of its common stock and warrants to purchase up to an aggregate of 1,250,000 shares of common stock." The September 2015 Prospectus contained the following table which purported to show the security ownership of certain beneficial owners and management:[17]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 25,891,072 shares of common stock outstanding on the date above, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| RTP Venture Fund (1) | 1,448,081 | 5.59% |
| Frost Gamma Investment Trust (2)** | 1,381,667 | 5.34% |
| Pinnacle Family Office Investments (3) | 1,333,333 | 5.15% |
| Andy Sassine (4) | 1,333,332 | 5.15% |
| Alpha Capital Anstalt (5)** | 1,332,313 | 5.15% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 1,448,081 | 5.59% |
| Jeffrey Ravetch, M.D., Ph.D. (8) | 142,616 | * |
| J. David Hansen (6) | 95,358 | * |
| Wolfgang W. Scholz, Ph.D. (9) | 67,741 | * |

---

[17] Footnotes to table omitted.

57

| | | |
|---|---|---|
| Robert E. Hoffman (7) | 21,116 | * |
| Kenneth M. Cohen (11) | 21,116 | * |
| Paul V. Maier (10) | 16,116 | * |
| Gregory P. Hanson (12) | 10,700 | * |
| Paul W. Maffuid, Ph.D. (13) | 8,763 | * |
| Thomas C. Varvaro | — | * |
| | | |
| **All executive officers and directors as a group (10 persons)** | 1,831,607 | 7.04% |

| | |
|---|---|
| * | Less than 1%. |
| ** | Based solely on the holder's filing with the Securities and Exchange Commission on Schedule 13G |

139.   On October 30, 2015 the Company filed its quarterly report for the quarter ended September 30, 2015 on Form 10-Q (the "2015 Q3 10-Q") with the SEC, signed by Defendants Hansen and Hanson.  The 2015 Q3 10-Q stated the following regarding the Company's common stock financing:

On March 31, 2015, the Company consummated the first closing of the April 2015 Private Placement and sold $4,714,726 of Units, net of $281,023 in issuance costs, consisting of 6,661,000 shares of common stock and warrants to purchase 3,330,500 shares of common stock at $1.50 a share. The Units were sold at a price of $0.75 per Unit.

On April 10, 2015, the Company consummated the second and final closing of the April 2015 Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 in the April 2015 Private Placement.

OPKO was the lead investor in the April 2015 Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock.

As a condition to OPKO's participation in the April 2015 Private Placement, each of the other investors in the April 2015 Private Placement agreed to

execute lockup agreements restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the April 2015 Private Placement.

On April 10, 2015, the Company agreed that $3.5 million of the net proceeds of such closing would be paid into and held under and the terms of an escrow agreement with Signature Bank, N.A pending the approval of a representative of OPKO or 10 weeks thereafter, unless released sooner or extended by the Company and OPKO.  On June 22, 2015 the Company and OPKO extended the termination date of the escrow to 16 weeks from the final closing of the April 2015 Private Placement. In connection with the OPKO investment, Steven Rubin, Esq. was appointed advisor to the Company. The escrowed funds were to be returned to the applicable investors and the Company shall have no further obligation to issue Units to such investors in the event certain release conditions are not met. On June 30, 2015 the Company and OPKO entered into a letter agreement pursuant to which the Company granted the representative the right, but not the obligation, until June 30, 2016, to nominate and appoint up to two additional members of the Company's Board, or to approve the person(s) nominated by the Company pursuant to the agreement in consideration for the release of the escrowed funds. The nominees will be subject to the satisfaction of standard corporate governance practices and any applicable national securities exchange requirements.  Upon signing the agreement, the escrowed funds were released to the Company.

140.   Regarding the warrants, the 2015 Q3 10-Q stated, in relevant part:

The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

* * *

Between April 13, 2015, and April 14, 2015, certain holders of warrants issued in the April 2015 Private Placement to purchase an aggregate of 1,849,999 shares of common stock exercised such warrants on a cashless basis for an

59

Verified Shareholder Derivative Complaint

aggregate issuance of 1,219,780 shares of common stock. As of September 30, 2015, there were 5,959,668 warrants outstanding to purchase common stock at $1.50 a share.

141.   Attached to the 2015 Q3 10-Q were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

142.   On January 28, 2016 the Company filed a registration statement on Form S-1 (the "January 2016 S-1"), "registering an aggregate of 3,904,830 shares (the "Resale Shares") of common stock, $0.01 par value per share." The January 2016 S-1 was signed by Defendants Hansen, Hanson, Cohen, Hoffman, Livingston, Maier, Ravetch, and Varvaro. The January 2016 S-1, as amended on February 8, 2016, was declared effective by the SEC on February 10, 2016.

143.   The January 2016 S-1 contained the following table which purported to show the security ownership of certain beneficial owners and management:[18]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 29,036,272 shares of common stock outstanding on the date above, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| RTP Venture Fund (1) | 1,449,383 | 4.99% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 1,449,383 | 4.99% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 142,616 | * |

---

[18] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| | | |
|---|---|---|
| J. David Hansen (3) | 97,963 | * |
| Wolfgang W. Scholz, Ph.D. (4) | 69,478 | * |
| Robert E. Hoffman (5) | 21,116 | * |
| Kenneth M. Cohen (6) | 21,116 | * |
| Paul V. Maier (7) | 16,116 | * |
| Gregory P. Hanson (8) | 12,322 | * |
| Paul W. Maffuid, Ph.D. (9) | 9,921 | * |
| Thomas C. Varvaro | — | * |
| **All executive officers and directors as a group (10 persons)** | 1,840,031 | 6.31% |

\*     Less than 1%.

\*\*    Based solely on the holder's filing with the Securities and Exchange Commission on Schedule 13G.

144. On March 3, 2016, the Company filed a prospectus on Form 424B3 (the "March 2016 Prospectus") "registering an aggregate of 3,904,830 shares (the "Resale Shares") of common stock, $0.01 par value per share" for sale by certain of the Company's shareholders. The March 2016 Prospectus contained the following table which purported to show the security ownership of certain beneficial owners and management:[19]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 29,036,272 shares of common stock outstanding on the date above, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| RTP Venture Fund (1) | 1,449,383 | 4.99% |

---

[19] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| Directors and Executive Officers | | |
|---|---|---|
| Philip O. Livingston, M.D. (1) | 1,449,383 | 4.99% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 142,616 | * |
| J. David Hansen (3) | 97,963 | * |
| Wolfgang W. Scholz, Ph.D. (4) | 69,478 | * |
| Robert E. Hoffman (5) | 21,116 | * |
| Kenneth M. Cohen (6) | 21,116 | * |
| Paul V. Maier (7) | 16,116 | * |
| Gregory P. Hanson (8) | 12,322 | * |
| Paul W. Maffuid, Ph.D. (9) | 9,921 | * |
| Thomas C. Varvaro | — | * |
| | | |
| All executive officers and directors as a group (10 persons) | 1,840,031 | 6.31% |

145.    The March 2016 Prospectus stated the following regarding the Company's authorized capital stock:

Our authorized capital stock consists of 150,000,000 shares of common stock, $0.01 par value, and 15 million shares of preferred stock, $0.01 par value. *As of January 25, 2016, there were 29,036,272 shares of common stock outstanding,* 185,039 shares of Series D Preferred Stock outstanding, and 33,333 shares of Series E Preferred Stock outstanding.

(Emphasis added.)

146.    The March 2016 Prospectus contained the same table describing of the selling stockholders' security ownership as was presented in the January 2016 S-1, reproduced above.

147.    On March 14, 2016, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-

K was signed by Defendants Hansen, Hanson, Cohen, Eisenberg, Hoffman, Livingston, Maier, Ravetch, and Varvaro.

148.   The 2015 10-K discussed the Company's financing activities, stating, in relevant part:

> **Oxford Loan** – On January 15, 2016, we entered into a Loan and Security Agreement with Oxford Finance LLC providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000.  On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement.
>
> **Underwritten Offering** – On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 2,500,000 shares of our common stock and 1,250,000 three-year warrants to purchase 1,250,000 shares of our common stock at an initial exercise price of $1.32 per share. The shares of common stock were sold at a public offering price of $1.10 per share and the warrants were sold at a price of $0.01 per warrant. The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.
>
> **April Private Placement** – On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $0.75 per unit, with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Preferred Shares) and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share (such sale and issuance, the "April Private Placement," or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015 in which we sold an aggregate of $4,995,750 of units. Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into separate subscription agreements for the sale of an additional $6,718,751 of units.

Verified Shareholder Derivative Complaint

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at Signature Bank. The escrowed funds were released [to] us on June 30, 2015 as part of a letter agreement giving OPKO the right, but not the obligation, until June 30, 2016, to nominate and have appointed up to two additional members of the our [sic] Board of Directors, or to approve the person(s) nominated by the Company. The nominees will be subject to satisfaction of standard corporate governance practices and any applicable national securities exchange requirements.

**Preferred and Warrant Holders Common Stock Exchange Agreements** – On March 25, 2015, we entered into separate exchange agreements (collectively, the "Exchange Agreements") with certain holders of our Series A-1 Preferred Stock and A-1 Warrants and holders of our Series B Preferred Stock and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 2,537,502 shares of our common stock and an aggregate of 238,156 shares of our newly designated Series D Convertible Preferred Stock (collectively the "Exchange Securities").

149.    Regarding the Company's internal controls, the 2015 10-K stated:

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2015, our internal control over financial reporting was effective.

150.    Attached to the 2015 10-K were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

---

64

Verified Shareholder Derivative Complaint

151.   On May 31, 2016, the Company filed a Schedule 14A filed with the SEC (the "2016 Proxy Statement"). The 2016 Proxy Statement included the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[20]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Applicable percentages are based on 30,787,770 shares of Common Stock outstanding as of May 27, 2016 adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | - | -% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 1,450,165 | 4.71% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 33,950 | * |
| J. David Hansen (3) | 589,066 | 1.89% |
| Robert E. Hoffman (4) | 43,950 | * |
| Kenneth M. Cohen (5) | 43,950 | * |
| Paul V. Maier (6) | 38,950 | * |
| Gregory P. Hanson (7) | 267,632 | * |
| Paul W. Maffuid, Ph.D. (8) | 192,801 | * |
| Thomas C. Varvaro (9) | 22,834 | * |
| Jeffrey F. Eisenberg | - | - |
| Paul Resnick | - | - |
| **All executive officers and directors as a group (11 persons)** | 2,683,848 | 8.51% |

* Less than 1%.

---

[20] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

152.   On August 16, 2016, the Company filed an amended registration statement on Form S-1/A, which amended the Form S-1 initially filed on May 17, 2016 (the "August 16, 2016 S-1/A"). August 16, 2016 S-1/A "offer[ed] $7,500,000 of shares of our common stock and warrants to purchase shares of our common stock." The August 16, 2016 S-1/A was signed by Defendants Hansen and Hanson, and by Defendant Hansen for Defendants Cohen, Hoffman, Livingston, Maier, Ravetch, Varvaro and Eisenberg. The August 16, 2016 S-1/A was declared effective by the SEC on August 16, 2016.

153.   The August 16, 2016 S-1/A contained the following table which purported to show the security ownership of certain beneficial owners and management:[21]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 4,230,780 shares outstanding as of August 8, 2016, after giving effect to the Listing Reverse Split.  Applicable percentages are based on 4,230,780 shares of common stock outstanding as of August 8, 2016 adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | - | -% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,144 | 4.63% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 9,318 | * |
| J. David Hansen (3) | 79,815 | 1.87% |
| Robert E. Hoffman (4) | 10,669 | * |
| Kenneth M. Cohen (5) | 10,669 | * |
| Paul V. Maier (6) | 9,993 | * |

---

[21] Footnotes to table omitted.

| | | |
|---|---|---|
| Gregory P. Hanson (7) | 36,331 | * |
| Paul W. Maffuid, Ph.D. (8) | 26,172 | * |
| Thomas C. Varvaro (9) | 7,815 | * |
| Jeffrey F. Eisenberg | - | - |
| Paul Resnick | - | - |
| **All executive officers and directors as a group (10 persons)** | 386,926 | 8.88% |

\*         Less than 1%.

154.   On August 18, 2016, the Company filed a prospectus on Form 424B4 (the "August 2016 Prospectus") "offering $8,625,000 of shares of our common stock and warrants to purchase shares of [MabVax] common stock." The August 2016 Prospectus contained the following table which purported to show the security ownership of certain beneficial owners and management:[22]

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | - | -% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,144 | 4.63% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 9,318 | * |
| J. David Hansen (3) | 79,815 | 1.87% |
| Robert E. Hoffman (4) | 10,669 | * |
| Kenneth M. Cohen (5) | 10,669 | * |
| Paul V. Maier (6) | 9,993 | * |
| Gregory P. Hanson (7) | 36,331 | * |
| Paul W. Maffuid, Ph.D. (8) | 26,172 | * |
| Thomas C. Varvaro (9) | 7,815 | * |
| Jeffrey F. Eisenberg | - | - |

---

[22] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

| | | |
|---|---|---|
| Paul Resnick | - | - |
| **All executive officers and directors as a group (10 persons)** | 386,926 | 8.88% |

\*       Less than 1%.

155.   On November 7, 2016 the Company filed its quarterly report for the quarter ended September 30, 2016 on Form 10-Q (the "2016 Q3 10-Q") with the SEC, signed by Defendants Hansen and Hanson. On March 1, 2017, the Company filed its report for the quarter and year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, signed Defendants Hansen, Hanson, Cohen, Eisenberg, Hoffman, Livingston, Maier, Ravetch, and Varvaro.

156.   The 2016 10-K stated the following regarding the Company's "Financing Activities":

**Financing Activities**

**August Public Offering** – On August 22, 2016, we closed a public offering of 1,297,038 shares of common stock and 665,281 shares of Series F Convertible Preferred Stock ("Series F Preferred Stock"), and warrants to purchase 1,962,319 shares of common stock at $5.55 per share and warrants to purchase 1,962,319 shares of common stock at $6.29 per share, at an offering price of $4.81 per share.  For every one share of common stock or Series F Preferred Stock sold, we issued one warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock at $6.29 per share.  We received $9,438,753 in gross proceeds, before underwriting discounts and commissions and offering expenses totaling $871,305.

**Oxford Loan** – On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the "Load and Security Agreement") providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. The option to draw the

second $5,000,000 expired on September 30, 2016.

**Underwritten Offering** – On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 337,838 shares of our common stock and 168,919 three-year warrants to purchase 168,919 shares of our common stock at an initial exercise price of $9.77 per share (all numbers adjusted for the Listing Reverse Split). The shares of common stock were sold at a public offering price of $8.14 per share and the warrants were sold at a price of $0.01 per warrant (adjusted for the Listing Reverse Split). The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

157.    The 2016 10-K continued, discussing the "April Private Placement" which took place in 2015:

**April Private Placement** – On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $5.55 per unit (adjusted for the Listing Reverse Split), with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Convertible Preferred Stock ("Series E Preferred Stock")) and a thirty-month warrant to purchase one half of one share of common stock at an initial exercise price of $11.10 per share (adjusted for the Listing Reverse Split), such sale and issuance, the "April Private Placement," or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015, in which we sold an aggregate of $4,995,750 of units. Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into separate subscription agreements for the sale of an additional $6,718,751 of units.

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at

Signature Bank. The escrowed funds were released to us on June 30, 2015, as part of a letter agreement giving OPKO the right, but not the obligation until June 30, 2016, to nominate and have appointed up to two additional members of our Board of Directors, or to approve the person(s) nominated by the Company. The nominees selected were required to meet certain standard corporate governance practices and applicable national securities exchange requirements.

158. The 2016 10-K then discussed exchange agreements entered into in March 2015:

**Preferred and Warrant Holders Common Stock Exchange Agreements – On** March 25, 2015, we entered into separate exchange agreements (collectively, the "Exchange Agreements") with certain holders of our Series A-1 Convertible Preferred Stock ("Series A-1 Preferred Stock") and A-1 Warrants and holders of our Series B Convertible Preferred Stock ("Series B Preferred Stock") and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 342,906 shares of our common stock (adjusted for the Listing Reverse Split) and an aggregate of 238,156 shares of our newly designated Series D Convertible Preferred Stock ("Series D Preferred Stock" and, collectively, the "Exchange Securities").

159. The 2016 10-K reported that the Company had evaluated its internal controls over financial reporting, and concluded that its disclosure controls were effective, stating, in relevant part:

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2016, our internal controls over financial reporting were effective.

160.   The 2016 10-K included the following table which purported to show the security ownership of certain beneficial owners and management. The 2016 10-K reported that three were no beneficial owners of 5% or more of the Company's outstanding common stock. However, Honig, Frost, and Brauser all filed Schedules 13G or 13G/A reflecting greater than 5% ownership within the two months prior to February 28, 2017:[23]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 6,296,110 shares outstanding as of February 28, 2017. Applicable percentages are based on 6,296,110 shares of common stock outstanding as of February 28, 2017 adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | — | —% |
| | | |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,286 | 3.12% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 12,404 | * |
| J. David Hansen (3) | 193,421 | 3.00% |
| Robert E. Hoffman (4) | 13,756 | * |
| Kenneth M. Cohen (5) | 23,113 | * |
| Paul V. Maier (6) | 13,080 | * |
| Gregory P. Hanson (7) | 89,100 | 1.40% |
| Paul W. Maffuid, Ph.D. (8) | 65,477 | 1.03% |
| Thomas C. Varvaro (9) | 10,902 | * |
| Jeffrey F. Eisenberg (10) | 2,253 | * |
| Paul Resnick (11) | 25,226 | * |
| **All executive officers and directors as a group (10 persons)** | 645,018 | 9.67% |

---

[23] Footnotes to table omitted.

* Less than 1%.

161.   Attached to the 2016 10-K were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

162.   On May 3, 2017, the Company filed its 2017 Proxy Statement. The 2017 Proxy Statement included the following table which purported to show ownership of MabVax securities by certain beneficial owners and Company management:[24]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 6,434,348 shares outstanding as of April 18, 2017, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| Dr. Phillip Frost, M.D. (12) | 422,334 | 6.56% |
| Barry Honig (13) | 391,648 | 6.09% |
| Michael Brauser (14) | 342,614 | 5.32% |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,286 | 3.05% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 12,404 | * |
| J. David Hansen (3) | 176,678 | 2.70% |
| Robert E. Hoffman (4) | 13,756 | * |
| Kenneth M. Cohen (5) | 23,113 | * |
| Paul V. Maier (6) | 13,080 | * |
| Gregory P. Hanson (7) | 80,608 | 1.24% |
| Paul W. Maffuid, Ph.D. (8) | 59,469 | *% |
| Thomas C. Varvaro (9) | 10,902 | * |
| Jeffrey F. Eisenberg (10) | 2,253 | * |
| Paul Resnick (11) | 25,226 | * |

---

[24] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

**All executive officers and directors as a group
(11 persons)**             613,775     9.13%

163. On May 12, 2017, the Company filed an amended registration statement on Form S-1/A amending, for the sixth time, the Form S-1 filed with the SEC on February 10, 2017 (the "May 12, 2017 S-1/A"). The May 12, 2017 S-1/A "offer[ed] 1,657,143 shares of our common stock at $1.75 per share and 1,000,000 shares of newly designated 0% Series G Convertible Preferred Stock, or Series G Preferred Stock." The May 12, 2017 S-1/A was signed by Defendants Hansen and Hanson, and by Defendant Hansen for Defendants Cohen, Hoffman, Livingston, Maier, Ravetch, Varvaro and Eisenberg. The May 12, 2017 S-1/A was declared effective by the SEC on May 12, 2017.

164. The May 12, 2017 S-1/A contained the following table which purported to show the security ownership of certain beneficial owners and management:[25]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 6,434,348 shares outstanding as of May 11, 2017, adjusted as required by rules promulgated by the SEC.
>
> * * *

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| Dr. Phillip Frost, M.D. (12) | 422,334 | 6.56% |
| Barry Honig (13) | 391,648 | 6.09% |
| Michael Brauser (14) | 342,614 | 5.32% |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,286 | 3.05% |

---

[25] Footnotes to table omitted.

| | | |
|---|---|---|
| Jeffrey Ravetch, M.D., Ph.D. (2) | 17,134 | * |
| J. David Hansen (3) | 176,678 | 2.70% |
| Robert E. Hoffman (4) | 18,486 | * |
| Kenneth M. Cohen (5) | 27,843 | * |
| Paul V. Maier (6) | 17,810 | * |
| Gregory P. Hanson (7) | 80,608 | 1.24% |
| Paul W. Maffuid, Ph.D. (8) | 59,469 | * |
| Thomas C. Varvaro (9) | 15,632 | * |
| Jeffrey F. Eisenberg (10) | 6,983 | * |
| Paul Resnick (11) | 25,226 | * |
| **All executive officers and directors as a group (11 persons)** | 642,155 | 9.51% |

\* Less than 1%.

165.   On May 16, 2017, the Company filed a prospectus on Form 424B5 (the "May 2017 Prospectus"), offering 1,342,858 shares of MabVax common stock at $1.75 per share and 1 million Series G Convertible Preferred Stock. The May 2017 Prospectus contained the following table which purported to show the security ownership of certain beneficial owners and management:[26]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 6,434,348 shares outstanding as of May 11, 2017, adjusted as required by rules promulgated by the SEC.
>
> \* \* \*

| **Name and Address of Beneficial Owner** | **Number of Shares of Common Stock** | **Percentage of Common Stock** |
|---|---|---|
| **5% Stockholders** | | |
| Dr. Phillip Frost, M.D. (12) | 422,334 | 6.56% |
| Barry Honig (13) | 391,648 | 6.09% |

---

[26] Footnotes to table omitted.

| | | |
|---|---|---|
| Michael Brauser (14) | 342,614 | 5.32% |
| **Directors and Executive Officers** | | |
| Philip O. Livingston, M.D. (1) | 196,286 | 3.05% |
| Jeffrey Ravetch, M.D., Ph.D. (2) | 17,134 | * |
| J. David Hansen (3) | 176,678 | 2.70% |
| Robert E. Hoffman (4) | 18,486 | * |
| Kenneth M. Cohen (5) | 27,843 | * |
| Paul V. Maier (6) | 17,810 | * |
| Gregory P. Hanson (7) | 80,608 | 1.24% |
| Paul W. Maffuid, Ph.D. (8) | 59,469 | * |
| Thomas C. Varvaro (9) | 15,632 | * |
| Jeffrey F. Eisenberg (10) | 6,983 | * |
| Paul Resnick (11) | 25,226 | * |
| **All executive officers and directors as a group (11 persons)** | 642,155 | 9.51% |

\* Less than 1%.

(Emphasis added.)

166.   On September 6, 2017, the Company filed a Schedule 14A filed with the SEC for a special meeting of stockholders (the "September 2017 Proxy Statement"), signed by Defendant Hansen. The special meeting was called for the stockholders to vote on, *inter alia*, "the potential issuance of up to an aggregate of 3,400,000 shares of common stock, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on August 11, 2017," and if such issuance was approved, "to approve the potential issuance of up to 6,500,000 shares of common stock upon conversion of Series K Preferred Stock issuable in connection with a financing consummated in August 2017, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on August 11, 2017." The proposals were ultimately approved by the

stockholders on October 2, 2017. The September 2017 Proxy Statement included the following table purporting to show the security ownership of certain beneficial owners and management:[27]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 11,145,430 shares outstanding as of August 28, 2017, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | | |
| **Directors and Executive Officers** | | |
| J. David Hansen (1) | 700,701 | 5.95% |
| Philip O. Livingston, M.D. (2) | 246,519 | 2.20% |
| Gregory P. Hanson CMA (3) | 92,298 | * |
| Kenneth M. Cohen (4) | 74,480 | * |
| Paul W. Maffuid, Ph.D. (5) | 68,096 | * |
| Paul V. Maier (6) | 64,447 | * |
| Thomas C. Varvaro (7) | 62,169 | * |
| Jeffrey F. Eisenberg (8) | 53,020 | * |
| Paul Resnick M.D. (9) | 30,293 | * |
| **All executive officers and directors as a group (9 persons)** | | |

167.   On November 13, 2017, the Company filed a Schedule 14A filed with the SEC for a special meeting of stockholders (the "November 2017 Proxy Statement"), signed by Defendant Hansen. The special meeting was called for the stockholders to vote on "the

---

[27] Footnotes to table omitted.

potential issuance of up to an aggregate of 9,666,667 shares of common stock, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on October 17, 2017, upon the conversion of 58,000 shares of the Company's newly authorized Series L Convertible Preferred Stock" and to ratify "the issuance of up to an aggregate of 2,900,000 restricted shares of common stock to certain investors in the Company's May 2017 public offering, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on May 3, 2017, including 1,968,664 shares of common stock underlying the Company's Series I Convertible Preferred Stock," among other things.

168.   The November 2017 Proxy Statement included the following table purporting to show the security ownership of certain beneficial owners and management:[28]

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 20,588,765 shares outstanding as of November 10, 2017, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
| --- | --- | --- |
| **5% Stockholders** | | |
| None | | |
| | | |
| **Directors and Executive Officers** | | |
| J. David Hansen (1) | 1,427,911 | 6.51% |
| Philip O. Livingston, M.D. (2) | 346,519 | 1.67% |
| Gregory P. Hanson CMA (3) | 541,457 | 2.57% |
| Kenneth M. Cohen (4) | 174,480 | * |

---

[28] Footnotes to table omitted.

| | | |
|---|---|---|
| Paul W. Maffuid, Ph.D. (5) | 474,478 | 2.26% |
| Paul V. Maier (6) | 164,447 | * |
| Thomas C. Varvaro (7) | 162,169 | * |
| Jeffrey F. Eisenberg (8) | 153,020 | * |
| Paul Resnick M.D. (9) | 60,237 | * |
| **All executive officers and directors as a group (9 persons)** | 3,504,718 | 14.76% |

169.   On January 16, 2018, the Company filed a registration statement on Form S-1/A, amending its Form S-1 filed with the SEC on December 12, 2017 (the "January 16, 2018 S-1/A"),  offering for sale up to 2,551,020 shares of the Company's common stock, The January 16, 2018 S-1/A signed by Defendants Hansen and Hanson, and by Defendant Hansen as attorney-in-fact for Defendants Cohen, Livingston, Maier, Varvaro and Eisenberg.

170.   The January 16, 2018 S-1/A contained the following table, purporting to show the beneficial ownership of Company stock by certain beneficial owners and management:[29]

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 22,982,695 shares outstanding as of January 11, 2018, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **5% Stockholders** | | |
| None | | |

---

[29] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

**Directors and Executive Officers**

| | | |
|---|---|---|
| J. David Hansen (1) | 1,235,221 | 5.23% |
| Philip O. Livingston, M.D. (2) | 309,492 | 1.34% |
| Gregory P. Hanson CMA (3) | 424,987 | 1.84% |
| Kenneth M. Cohen (4) | 174,480 | * |
| Paul W. Maffuid, Ph.D. (5) | 368,627 | 1.60% |
| Paul V. Maier (6) | 164,447 | * |
| Thomas C. Varvaro (7) | 162,169 | * |
| Jeffrey F. Eisenberg (8) | 153,020 | * |
| Paul Resnick M.D. (9) | 51,697 | * |
| **All executive officers and directors as a group (9 persons)** | 3,044,131 | 12.67% |

171.   On January 18, 2018, the Company filed a registration statement on Form S-1/A, amending its Form S-1 filed with the SEC on December 15, 2017 offering for sale 6,965,569 shares of common stock for sale by certain stockholders, (the "January 18, 2018 S-1/A"). The January 18, 2018 S-1/A was signed by Defendants Hansen and Hanson, and by Defendant Hansen as attorney-in-fact for Defendants Cohen, Livingston, Maier, Varvaro and Eisenberg. The January 18, 2018 S-1/A provided the following table, purporting to show the beneficial ownership of Company stock by certain beneficial owners and management:[30]

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 22,982,695 shares outstanding as of January 16, 2018 adjusted as required by rules promulgated by the SEC.

| | Number of Shares of Common Stock | Percentage of Common Stock |
|---|---|---|
| **Name and Address of Beneficial Owner** | | |

---

[30] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

**5% Stockholders**
None

**Directors and Executive Officers**

| | | |
|---|---|---|
| J. David Hansen (1) | 1,235,221 | 5.23% |
| Philip O. Livingston, M.D. (2) | 309,492 | 1.34% |
| Gregory P. Hanson CMA (3) | 424,987 | 1.84% |
| Kenneth M. Cohen (4) | 174,480 | * |
| Paul W. Maffuid, Ph.D. (5) | 368,627 | 1.60% |
| Paul V. Maier (6) | 164,447 | * |
| Thomas C. Varvaro (7) | 162,169 | * |
| Jeffrey F. Eisenberg (8) | 153,020 | * |
| Paul Resnick M.D. (9) | 51,697 | * |
| **All executive officers and directors as a group (9 persons)** | 3,044,131 | 12.67% |

172.   The statements in ¶¶ 118-171 herein were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) MabVax engaged in the Reporting Misconduct and the Pump & Dump Misconduct; (2) MabVax had permitted certain shareholders to wield improper influence or control over the Company and its officers and directors; (3) the Company failed to maintain internal controls over financial reporting; and, (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading, and lacked a reasonable basis in fact.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

173.   On January 30, 2018, the Company filed a Form 8-K with the SEC. The Form 8-K included a press release as an attachment, which disclosed that MabVax had received

a notice that the SEC was conducting an investigation into the Company. The press release stated, in relevant part:

> MabVax Therapeutics Holdings, Inc. (NASDAQ: MBVX) ("MabVax" or the "Company"), a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer, today announced that it received notice that the Securities and Exchange Commission ("SEC") was conducting an investigation and examination pursuant to Section 8(e) of the Securities Act of 1933, as amended, relating to certain of the Company's registration statements (and amendments thereto). The Company intends to cooperate fully with the SEC's examination.

174.   On this news, the Company's share price fell $0.47, or approximately 18%, from the previous day's closing price, closing at $2.19 per share on January 30, 2018.

175.   Nevertheless, Defendants' false and misleading statements continued.

176.   On April 2, 2018, the Company filed its report for the quarter and year ended December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC, signed Defendants Hansen, Hanson, Cohen, Eisenberg, Livingston, Maier, and Varvaro.

177.   The 2017 10-K included the following table which purported to show the security ownership of certain beneficial owners and management:[31]

> Beneficial ownership is determined in accordance with the rules and regulations of the SEC. . . . Percentage ownership calculations for beneficial ownership are based on 8,961,840 shares outstanding as of April 2, 2018, adjusted as required by rules promulgated by the SEC.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Common Stock |
| --- | --- | --- |

---

[31] Footnotes to table omitted.

Verified Shareholder Derivative Complaint

**5% Stockholders**
None

**Directors and Executive Officers**

| | | |
|---|---|---|
| J. David Hansen (1) | 405,550 | 4.42% |
| Philip O. Livingston, M.D. (2) | 108,999 | 1.21% |
| Gregory P. Hanson CMA (3) | 134,723 | 1.50% |
| Kenneth M. Cohen (4) | 54,953 | * |
| Paul W. Maffuid, Ph.D. (5) | 115,207 | 1.28% |
| Paul V. Maier (6) | 49,527 | * |
| Thomas C. Varvaro (7) | 48,769 | * |
| Jeffrey F. Eisenberg (8) | 45,206 | * |
| Paul Resnick M.D. (9) | 16,210 | * |

**All executive officers and directors as a group (9 persons)**

178.   The 2017 10-K reported that the Company had evaluated its internal controls over financial reporting, and concluded that its disclosure controls were effective, stating, in relevant part:

> We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2017, our internal controls over financial reporting were effective.

179.   Attached to the 2017 10-K were SOX certifications signed by Defendants Hansen and Hanson attesting to its accuracy.

180.   The statements in ¶¶ 176-179 herein were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) MabVax engaged in the Reporting Misconduct and the Pump & Dump Misconduct; (2)

MabVax had permitted certain shareholders to wield improper influence or control over the Company and its officers and directors; (3) the Company failed to maintain internal controls over financial reporting; and, (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading, and lacked a reasonable basis in fact.

### The Truth Emerges

181.   On May 21, 2018, the Company filed a Form 8-K with the SEC providing further details regarding the SEC's investigation into potential violations of the securities laws by MabVax and its officers and directors (the "May 2018 8-K"). The Form 8-K also disclosed that the SEC is also investigating potential violations by holders of MabVax stock. The Form 8-K stated, in relevant part:

> ***We believe the SEC is investigating (i) potential violations by the Company and its officers, directors and others of Section 10(b) of the Securities and Exchange Act of 1934, as amended*** (as amended, the "Exchange Act") ***and Section 17(a) of the Securities Act of 1933, as amended*** (as amended, the "Securities Act"); ***and (ii) potential violations by multiple holders of our preferred stock of the reporting and disclosure requirements imposed by Section 13(d) of the Exchange Act and pursuant to Schedules 13D and 13G***. We further believe the SEC Investigation pertains to our relationships with multiple of those holders of our preferred stock, including (i) the circumstances under which those stockholders invested in the Company and whether they have acted as an undisclosed group in connection with their investment; (ii) the manner with or in which those stockholders may have sought to control or influence the Company and its leadership since their respective investments (and the extent to which those efforts to control or influence have been successful); and (iii) ***our prior disclosures regarding the control of the Company and beneficial ownership of our common and preferred stock included in our registration statements filed in 2017 and 2018 and in our Exchange Act reports***. In light of the SEC Investigation, we have also reviewed facts and circumstances related to our recently completed

May 2018 offering and publicly available information concerning certain of our stockholders' relationships with other registrants.

We have cooperated with the SEC in connection with the SEC Investigation, and our Board of Directors has appointed a Special Committee comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation. However, we cannot predict when the SEC Investigation will conclude, nor whether it will conclude in a manner adverse to the Company, any of its directors and officers, or its current or former stockholders. We also cannot predict, how the SEC Investigation or any related matters may impact how the Company is perceived by the market, potential partners and potential investors in our securities. We do not believe that the SEC would declare effective any registration statements registering our securities effective during the pendency of the SEC Investigation.

(Emphasis added.)

182. The May 2018 8-K continued, shifting the blame to the Company's stockholders:

> ***Historically, we have calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of our stockholders***, including reports filed on Schedules 13D and 13G and information provided by these stockholders directly to us. ***We have similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and our review of the matters under investigation (including information learned recently) has raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in the Company***. If certain stockholders have indeed acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in our prior beneficial ownership disclosures.

(Emphasis added.)

183. Finally, the May 2018 8-K discussed the adverse consequences of the SEC's investigation, including a delay in filing the Company's Form 10-Q for the fiscal quarter

84

ended March 31, 2018, and a conclusion by the Board that the Company's financial statements and registration statements from 2014 to the date of the Form 8-K could not be relied on "with respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures." The May 2018 8-K stated, in relevant part:

> In light of the SEC Investigation and our ongoing review of presently known facts and circumstances (including information learned recently), ***our Board of Directors, upon the recommendation of our management, has determined that we are unable to file a Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (the "Form 10-Q") at this time in accordance with applicable rules and regulations***.

> Our Board of Directors discussed the matters disclosed in this Current Report on Form 8-K with our independent auditors.

> ***On May 20, 2018, our Board of Directors, upon the recommendation of management, concluded that our prior annual and interim period financial statements for the years 2014, 2015, 2016 and 2017 included in our Reports on Form 10-K and Form 10-Q for such years, and our registration statements filed during the years 2014, 2015, 2016, 2017 and to date for 2018 with respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures should not be relied upon***. Accordingly, on May 20, 2018 our auditors withdrew their audit reports included in our Annual Reports on Form 10-K for the years 2014, 2015, 2016 and 2017. Therefore, investors in our common stock are cautioned not to rely on these financial statements and not to rely on our prior disclosures regarding the beneficial ownership of our capital stock included in our registration statements, Exchange Act reports and other filings filed with the SEC on or after January 1, 2014.

> On May 21, 2018, we notified the Listing Qualifications Department of the Nasdaq Stock Market (the "Staff") that we would not be filing our Form 10-Q, as required for continued listing on the Nasdaq Capital Market per Nasdaq listing rule 5250(c)(1) (the "Rule"). Nasdaq may provide us a period of time to submit a plan to regain compliance with the Rule (the "Plan"). However,

Verified Shareholder Derivative Complaint

> while we are exercising efforts to maintain the listing of our common stock
> on the Nasdaq Capital Market and efforts to enable filing of the Form 10-Q,
> there can be no assurance that the Company will complete a Plan in a timely
> manner, if at all, or that the Staff will accept any Plan or that if a Plan is
> accepted, the Staff will grant the Company any grace period in which to
> comply with the Rule. There can also be no assurance that we will again be in
> a position to file the Form 10-Q or any other periodic Exchange Act report.

(Emphasis added.)

184.   On this news, the Company's share price fell $0.41, or approximately 23%,

from the previous trading day's closing price, closing at $1.36 per share on May 21, 2018.

185.   On June 28, 2018, the Company filed a Form 8-K with the SEC and attached

a press release dated June 27, 2018 thereto (the "June 2018 8-K"). The June 2018 8-K

revealed that the Company had received a superseding letter from NASDAQ, informing

the Company that it had determined to shorten the time for MabVax to submit a plan to

regain compliance with filing requirements. The June 2018 8-K stated, in relevant part:

> On June 21, 2018, we received a second letter from the Staff superseding the
> May 21, 2018 Letter (the "Superseding Letter"). Per the Superseding Letter,
> the Staff determined to apply more stringent criteria and to shorten the time
> period for the Company to submit its Plan from 60 days to a new due date of
> June 28, 2018 pursuant to Nasdaq's discretionary authority set forth in Nasdaq
> Listing Rule 5101. ***The reason for the acceleration of this due date,
> according to the Superseding Letter, was based upon the Company's
> continued delay in filing the Form 10-Q and the disclosure that the
> Company's independent auditor withdrew its audit reports included in the
> Forms 10-K for the years ended December 31, 2014, through 2017*** included
> in the May 21, 2018 Current Report.

(Emphasis added.)

186.   On this news, the Company's share price fell $0.05, or approximately 5.5%,

from the previous trading day's closing price, closing at $0.85 per share on June 29, 2018.

86

187.   On July 11, 2018, the Company's common stock was delisted by Nasdaq.

188.   As of the date of filing this Complaint, the Company had not filed its Form 10-Q for the quarter ended March 31, 2018, nor had it filed any periodic reports for any subsequent period.

189.   The Company's common stock closed at $0.45 per share on October 2, 2018, the last trading day prior to this filing, representing a 47% decline from its closing price on June 29, 2018.

## DAMAGES TO MABVAX

190.   As a direct and proximate result of the Individual Defendants' conduct, MabVax has lost and will continue to lose and expend many millions of dollars.

191.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, legal fees and costs associated with the SEC investigation—including the costs associated with the Special Committee appointed to review matters believed to be under investigation—any internal investigations, restatement of financial statements, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.   These expenditures also include costs associated with the Company's delisting from NASDAQ, including any costs incurred in attempting to prevent the delisting, and any costs incurred in seeking to relist on the NASDAQ.

193.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

194.   As a direct and proximate result of the Individual Defendants' conduct, MabVax has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future and cause the Company to lose customers due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

195.   Plaintiff brings this action derivatively and for the benefit of MabVax to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MabVax, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

196.   MabVax is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.   Plaintiff is, and has been at all relevant times, a shareholder of MabVax. Plaintiff will adequately and fairly represent the interests of MabVax in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

# DEMAND FUTILITY ALLEGATIONS

198.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

199.   A pre-suit demand on the Board of MabVax is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following three individuals: Defendants Hansen, Hanson, and Livingston (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to two of the three Directors who are on the Board at the time this action is commenced.

200.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they knowingly or recklessly engaged to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

201.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the scheme to make and/or cause the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus, excused.

202.   Additional reasons that demand on Defendant Hansen is futile follow. Defendant Hansen has served as the Company's President, CEO and Chairman of the Board since the Telik Merger. Prior to the Telik Merger, Defendant Hansen served in the same roles at MabVax Therapeutics, Inc. since his co-founding of it in 2006. Thus, as the Company admits, Defendant Hansen is a non-independent director. Defendant Hansen receives handsome compensation for his service, including $975,565 in the fiscal year ended December 31, 2016, and $2,165,915 in the year ended December 31, 2017. Defendant Hansen also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed all of the periodic filings and all of the registration statements referenced above. As an officer and director, he conducted little, if any, oversight of the Defendants' engagement in the scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. And as a Company CEO he assisted the Frost Conspirators in engaging in the Pump & Dump Misconduct, as detailed in the SEC Action. Moreover, Defendant Hansen is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Hansen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.   Additional reasons that demand on Defendant Hanson is futile follow. Defendant Hanson has served as the Company's CFO since the Telik Merger. Prior to the

Telik Merger Defendant Hanson served in the same role at MabVax Therapeutics, Inc. since 2014. Thus, Defendant Hanson is a non-independent director. Defendant Hanson receives handsome compensation for his service including $476,930 in the fiscal year ended December 31, 2016 and $848,201 in the year ended December 31, 2017. Defendant Hanson also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed all of the periodic filings and all of the registration statements referenced above. As an officer, he conducted little, if any, oversight of the Defendants' engagement in the scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hanson is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Hanson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.   Additional reasons that demand on Defendant Livingston is futile follow. Defendant Livingston has served as the Company's Chief Science Officer and member of the Board since the Telik Merger, and served in the same roles at MabVax Therapeutics, Inc. since 2012. Thus, as the Company admits, Defendant Livingston is a non-independent director. Defendant Livingston also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K/A, 2015 10-K, 2016 10-K and 2017 10-K and all of the registration statements referenced above, either

91

personally or through Defendant Hansen. As an officer and director, he conducted little, if any, oversight of the Defendants' engagement in the scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Further, Defendant Livingston spent over 30 years at Memorial Sloan-Kettering Cancer Center ("MSK") running the Cancer Vaccinology Laboratory research lab prior to joining the Company's Board of Directors. Upon information and belief, Defendant Livingston retains social and professional connections with his former colleagues at MSK. MabVax has licensed from MSK "the exclusive world-wide developmental and commercial rights to receive biological materials from vaccinated clinical trial participants enrolled in any of the clinical trials involving the vaccines licensed to us, allowing us to discover human monoclonal antibody-based therapeutics." Further, as announced on May 31, 2017, MabVax and MSK have entered into a sponsored research agreement under which MabVax will provide funding for the development of certain "T-cell therapeutics using antibody targeting sequences derived from MabVax's fully-human antibodies for pancreatic, small cell lung, and other solid tumor cancers." Thus, Defendant Livingston cannot evaluate a demand with independence as he may fear retaliation against his former employer or former colleagues, and derailing of the research he has devoted his professional career to, as a result of granting a demand. Thus, for these reasons, Defendant Livingston breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.   Additional reasons that demand on the Board is futile follow.

206.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and two of whom are defendants in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

207.   For example, Defendants Hansen and Livingston both served together on the Board of MabVax Therapeutics Inc. prior to the Telik Merger. Further, Defendants Hansen, Hanson and Livingston all served MabVax Therapeutics Inc. together as senior executive officers. Such personal and professional connections prevent the Directors from evaluating a demand with independence, especially in light of the substantial likelihood of liability faced by Defendants Hansen and Hanson in the Securities Class Action.

208.   The Directors have also caused the Company to implement a number of corporate features which serve to entrench their positions on the Board. As the 2017 10-K discloses, the Company has adopted a classified board, authorizes "the issuance of 'blank check' preferred stock that could be issued by our Board of Directors to increase the number of outstanding shares or change the balance of voting control and thwart a takeover attempt," and prohibits cumulative voting. These governance features demonstrate the

Directors' interest in retaining control of MabVax, and their inability to evaluate a demand with disinterest.

209.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

210.   MabVax has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MabVax any part of the damages MabVax suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

211.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the

extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

212.   The acts complained of herein constitute violations of fiduciary duties owed by MabVax's officers and directors, and these acts are incapable of ratification.

213.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MabVax. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of MabVax, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

214.    If there is no directors' and officers' liability insurance, then the Directors will not cause MabVax to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

215.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MabVax's business and affairs.

218.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MabVax.

220.   Also in breach of their fiduciary duties owed to MabVax, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) MabVax engaged in the Reporting Misconduct and the Pump & Dump Misconduct; (2) MabVax had permitted certain shareholders to wield improper influence or control over the Company and its officers and directors; (3) the Company failed to maintain internal controls over financial reporting; and, (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading, and lacked a reasonable basis in fact.

221.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

222.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

223.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations

and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MabVax's securities.

224.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge and/or acted with reckless disregard for the truth that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth that Defendants were causing the Company to engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MabVax's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

225.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

226.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MabVax has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.   Plaintiff on behalf of MabVax has no adequate remedy at law.

98

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

228.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MabVax.

230.   The Individual Defendants received bonuses, stock options, or similar compensation from MabVax that was tied to the performance or artificially inflated valuation of MabVax, and/or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, including, but not limited to, the Pump & Dump Misconduct.

231.   Plaintiff, as a shareholder and a representative of MabVax, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

232.   Plaintiff on behalf of MabVax has no adequate remedy at law.

# THIRD CLAIM

## Against Individual Defendants for Abuse of Control

233.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MabVax, for which they are legally responsible.

235.   As a direct and proximate result of the Individual Defendants' abuse of control, MabVax has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, MabVax has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

236.   Plaintiff on behalf of MabVax has no adequate remedy at law.

# FOURTH CLAIM

## Against Individual Defendants for Gross Mismanagement

237.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MabVax in a manner consistent with the operations of a publicly-held corporation.

239.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MabVax has sustained and will continue to sustain significant damages.

240.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

241.   Plaintiff on behalf of MabVax has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

242.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.   The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused MabVax to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

244.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.   Plaintiff on behalf of MabVax has no adequate remedy at law.

Verified Shareholder Derivative Complaint

# PRAYER FOR RELIEF

246.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of MabVax, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to MabVax;

(c)   Determining and awarding to MabVax the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing MabVax and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MabVax and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of MabVax to nominate at least

Verified Shareholder Derivative Complaint

two candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding MabVax restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 4, 2018                Respectfully submitted,

                                               **THE ROSEN LAW FIRM, P.A.**
/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
***Counsel for Plaintiff***

103

DocuSign Envelope ID: 753EB5D0-FC6B-453D-A31J-AA06F578516F

<u>VERIFICATION</u>

I, Brian Jackson am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of September 2018.

10/2/2018 10:59:29 AM PDT

DocuSigned by:

7BBD9589727C4F3...

Brian Jackson